1  Shumaker, Loop & Kendrick, LLP
   Steven M. Berman, Bar No. 256846
2  sberman@shumaker.com
   101 East Kennedy Boulevard
3  Suite 2800
   Tampa, Florida 33602
4  Telephone:   813.229.7600
   Facsimile:   813.229.1660
5
   Attorneys for Defendant
6  Sharon Day

7

8              **UNITED STATES DISTRICT COURT**

9     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11  CATALINA YACHTS, INC., a              Case No. 2:25-CV-04090-SVW-RAO
    California Corporation,
12                                        Assigned to the Hon. Stephen V.
                    Plaintiff,            Wilson
13
         v.                              **DEFENDANT/COUNTERCLAIM**
14                                       **PLAINTIFF SHARON DAY'S**
    SHARON DAY, an individual;           **OPPOSITION TO CATALINA**
15  GERARD DOUGLAS, an individual;       **YACHTS, INC.'S RENEWED**
    and DOES 1 through 10, inclusive,    **MOTION FOR SUMMARY**
16                                       **JUDGMENT**
                    Defendants
17

18  GERARD DOUGLAS,                       Date: March 16, 2026
                                          Time: 1:30 p.m.
19                  Plaintiff             Courtroom 10A

20       v.
                                          Action Filed: May 7, 2025
21  CATALINA YACHTS, INC., a             Trial Date: April 21, 2026
    California Corporation, RUSSELL
22  LANE BERNEY, as Trustee, JEAN C.
    BUTLER, as Trustee, MICHAEL
23  REARDON, an individual, and ROES 1
    through 5, as Trustees, inclusive,
24                  Defendants.

25
    and
26

27  SHARON DAY,

28

Shumaker, Loop &
Kendrick, LLP
Attorneys at Law
Tampa

- 1 -

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

Counterclaim Plaintiff,

v.

CATALINA YACHTS, INC.,
a California Corporation,

          Counterclaim
          Defendant.

## **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ……………………………………………………… 6

II.    STATEMENT OF FACTS ………………………………………..10

III.   THE BURDEN IS ON CATALINA TO SHOW THERE IS NO DISPUTE AS TO ANY MATERIAL FACTS……………………………….. 12

IV.   CATALINA IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS DECLARATORY RELIEF CLAIM ……………………………... 15

    A.   Catalina's Motion Depends Upon Disputed Facts About Asset Retention and Proceeds ……………………………………... 15

    B.   The Agreement is Reasonably Susceptible to Ms. Days's Interpretation ………………………………………………………… 18

    C.   No "Appeal to Equity" Would be Undermined by Any Rescission of the Reardon Transaction …………………………………………20

V.    EACH OF MS. DAY'S COUNTERCLAIMS PRESENTS GENUINE ISSUES OF MATERIAL FACT ……………………………………… 21

    A.   Breach of Contract …………………………………………….. 21

    B.   Breach of Implied Covenant of Good Faith ………………….. 21

    C.   Promissory Estoppel ………………………………………….. 23

    D.   Fraudulent Transfer ……………………………………………. 24

VI.   MS. DAY'S RENEWED MOTION FOR PARTIAL SUMMARY

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

- 2 -

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

1

JUDGMENT CONFIRMS THAT CATALINA'S MOTION FAILS........ 33

2    VII.    CONCLUSION ......................................................................34

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

1

## <u>TABLE OF AUTHORITIES</u>

2  **Federal Cases**

3

4  *Barris Indus., Inc. v. Worldvision Enters., Inc.*,
      875 F.2d 1446, 1450 (9th Cir. 1989) …………………………………………….18

5  *Celotex Corp. v. Catrett*,
      477 U.S. 317, 323-24 (1986) …………………………………………………..13

6

7  *In re Med. Capital Sec. Litig.*,
      2013 WL 1344969, at *3 (C.D. Cal. Apr. 2, 2013) …………………………...14

8  *Kaisha v. Dodson*,
      423 B.R. 888, 901 (N.D. Cal. 2010) …………………………………………...26

9

10  *Maffei v. N. Ins. Co. of New York*,
      12 F.3d 892, 898 (9th Cir. 1993) ……………………………………………...14

11  *McCollum v. XCare.net, Inc.*,
      212 F. Supp.2d 1142 (N.D. Cal. 2002) ………………………………………...22

12

13  *Ohashi v. Verit Indus.*,
      536 F.2d 849, 853 (9th Cir. 1976) …………………………………………… 23

14

15  *S. California Gas Co. v. City of Santa Ana*,
      336 F.3d 885, 888 (9th Cir. 2003) ……………………………………………..14

16

17  *Seoul Semiconductor Co., Ltd. v. Finelite, Inc.*,
      694 F. Supp. 3d 1199, 1209 (N.D. Cal. 2023) ………………………………....19

18  *Smith v. Simmons*,
      638 F. Supp. 2d 1180, 1193 (E.D. Cal. 2009) …………………………………19

19

20  *United States v. May*,
      600 F. Supp. 339, 341—42 (S.D. Cal. 1984) …………………………………..31

21  **State Cases**

22

23  *Catalina Yachts, Inc. v. Michael Reardon*,
      No. 25-005251-CI (Fla. 6th Jud. Cir., Pinellas Cnty.) …………………………21

24

25  *Garcia v. World Sav., FSB*,
      183 Cal. App. 4th 1031 (2010) …………………………………………………..24

26

27  *Neisendorf v. Levi Strauss & Co.*,
      143 Cal. App. 4th 509, 522-23 (2006) …………………………………………19

28

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

- 4 -

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

**Statutes**

Cal. Civ. Code § 3439.04(a) …………………………………………………………24

Cal. Civ. Code § 3439.05 …………………………………………………………31

Fla. Stat. § 726.105(1)(a)-(b) ……………………………………………………25

Fla. Stat. § 726.106 ………………………………………………………….....31

Fed. R. Civ. P. 56(a) ……………………………………………………….....13

Shumaker, Loop &
Kendrick, LLP
Attorneys at Law
Tampa

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

## I.    INTRODUCTION

Catalina Yachts, Inc.'s ("Catalina") Motion for Summary Judgment [Doc. 122] (the "Motion") rests on a fictionalized version of the facts and a contested contract interpretation that collapses once the actual record is considered.  Catalina contends it is entitled to judgment as a matter of law, both on account of the relief requested in its Complaint and in opposition to Ms. Day's counterclaim and related summary judgment motion, because, according to Catalina, "[t]his entire action is resolved by the terms of the parties' contract," (Doc. 122, 8:3), and the contract "leaves no room for any other interpretation" than Catalina's interpretation.  (Doc. 122, 8:11-12).  Catalina's *ipse dixit* assertions fail to survive this Court's interrogation of Catalina's position at the first status hearing in this case, as well as Catalina's own president's recently taken testimony.  The record reveals a very different story from that which Catalina's lawyers advocate.  Catalina's lawyer's propositions, as distinguished from Catalina's president's admissions, are, in reality, contested interpretations and not facts.  Not only does the record not undisputedly establish Catalina's interpretation of the contract, the record contradicts Catalina's lawyer's assertions, and those disputed issues of fact preclude judgment as a matter of law.  The *undisputed* evidence establishes that:

(1)    Sharon Day has, in fact, earned the entirety of her deferred compensation, based on the terms and provisions of her Bonus Compensation

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

Agreement, affording her—at a minimum—a right to payment of her bonus compensation (notwithstanding any disputes over the present or future timing of payment), and she is entitled to judgment as a matter of law on her counterclaim as to Catalina's liability for her bonus compensation;

(2)     As to timing of payment, as this Court explored at the initial status conference in this case, the subject Bonus Compensation Agreement, drafted by Catalina's founder and patriarch, is ambiguous, containing multiple provisions regarding the timing of payment (not entitlement) that pull in different directions, including definitions and conditions that interact imperfectly across scenarios involving a stock sale versus an asset sale, so as to permit the consideration of parol evidence in the Bonus Compensation Agreement's interpretation, specifically as it relates to the timing of the earned deferred compensation; and

(3)     At the time of multiple fraudulent transfers, Sharon Day was a present or future creditor of Catalina, along with other creditors, and Catalina transferred substantial assets, particularly and most importantly through the Salt Creek Transfers (as defined herein), in order to avoid its obligations to then-present and future creditors, including Ms. Day, for no consideration and that Catalina lacked the liquidity to pay creditors even though it transferred $12.5 million worth of property for no consideration.  These uncontroverted facts establish that, under both California

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

and Florida law, Catalina actually and/or constructively fraudulently transferred its assets.

Catalina and its insiders monetized all or almost all of Catalina's operating assets through multiple transactions—including a $1 million "church property" sale in November 2020 [AUMF No. 44], a $12.5 million "Salt Creek" marina property sale, structured through the creation of a newly created insider entity, while depriving the operating company and its present and future creditors of the proceeds, in July 2024 [AUMF No. 45], and the asset and operations sale in April 2025 in exchange for a $1 million promissory note and the assumption of approximately $1.425 million in liabilities [AUMF No. 46]. At this point, Sharon Day is entitled to at least 5% of $15,925,000, or $796,250, along with interest, penalties, costs and attorneys' fees, with some property remaining, but not in use by Catalina at present, and five percent of the value of that property along with interest, penalties, costs and attorneys' fees. [AUMF No. 47]. Indeed, Catalina's president testified that "for sure [Ms. Day has] reached [the Agreement's 'when bonus is earned' requirements] because she worked over the seven and a half years…" [AUMF No. 48, Reese Dep. 49:6-12]. Catalina no longer has any real operations in the traditional sense but has deprived itself and creditors, including Sharon Day, of over $796,250 over the course of the past five years and two months, and now Catalina no longer operates in the traditional sense. [AUMF No. 49]. More importantly Catalina was deprived of the property it held,

along with the cash proceeds from those transfers, with which they could pay

employees, vendors and other creditors including Sharon Day on account of both her

deferred compensation and monies due and owing on credit cards taken out in Sharon

Day's name with her credit but used by Catalina both prior to and after the fraudulent

transfers at issue.  [AUMF No. 49, 52]

Sharon Day's Renewed Motion for Partial Summary Judgment (Doc. 119)

demonstrates these points and, standing alone, defeats Catalina's Motion.  Without

support, Catalina's position is that the Bonus Compensation Agreement (the

"Agreement") "leaves no room for any other interpretation" than its own and that

nothing happened that could implicate the Agreement.  [Doc. 122, 8:11-12].  The

record reflects both the uncontested reality that Catalina owes Sharon Day her

deferred compensation because she has met all requirements for Catalina's liability

and Catalina agreed.  Notwithstanding Catalina's counsel's unsupported argument,

Catalina's president admitted the timing provisions of the Bonus Compensation

Agreement are both "confusing" and "unclear" and, as a result, genuine disputes of

material fact exist regarding when the bonus compensation obligation should be paid,

precluding summary judgment.  [AUMF No. 50, 51].  Additionally, Catalina has

acted in bad faith, from selling off assets without addressing payment obligations

[AUMF No. 52], to misleading Ms. Day's counsel about Catalina's intentions of

paying Ms. Day from sale transactions, to now taking the position that Ms. Day may

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

never be paid, to the fact that Catalina brought this litigation without the knowledge of its current president—underscores Catalina's bad faith and need for judicial intervention to address the timing of an admitted current obligation of Catalina.    As the record shows, Marc Reese—Catalina's current president and son-in-law of former president Frank and his wife Jean Butler—testified that he was unaware that Catalina initiated this litigation against Ms. Day.  [AUMF No. 53].

## II.    STATEMENT OF FACTS

Frank Butler, Jean Butler and Sharon Day signed the Bonus Compensation Agreement on or about November 18, 2002.  [Catalina Yachts, Inc.'s Statement of Uncontroverted Facts [Doc. 122-1] ("UMF") No. 1].    Pursuant to the Agreement, Section 1.1, Ms. Day earned the deferred compensation  when she continued to work for Catalina for much longer than the requisite 7.5 years after signing the Agreement on November 18, 2002.  [UMF Nos. 3, 5].  Ms. Day remained employed by Catalina for more than 7.5 years.  [UMF No. 4].  Accordingly, Ms. Day's right to her deferred compensation vested on or about May 18, 2010. [AUMF No. 54].  "Bonus" is "additional compensation equal to five percent (5%) of the: (i) net sales price; or (ii) value of Catalina, whichever is appropriate," with a "Minimum Bonus" of "no less than one million ($1,000,000)" "if all conditions of [the] Agreement are satisfied." [AUMF No. 47].

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

Catalina sold substantial assets after Ms. Day's right vested, including an approximately $1 million sale of property to Generation Church of Tampa Bay, Inc. in November 2020 (the "First Sale") [AUMF No. 44]; an approximately $12.5 million sale of property to Prometheus Maritime Properties, through a related party transaction (the "Second Sale" or "Salt Creek Sale") in July 2024 [AUMF No. 45]; and the $2.425 million, in note and debt assumption, April 2025 asset sale to Michael Reardon, which Catalina itself characterized as the disposition of its remaining operating assets (the "Third Sale"). [AUMF No. 34].

Catalina asserted that there is no evidence "that, at the time of or following the Salt Creek Sale[,] Catalina was engaged in any transaction for which its assets were unreasonably small, or that Catalina incurred debts that it was unable to pay, or that it was at any time insolvent." [Doc. 122, 24:22-25]. The record unquestionably establishes the opposite. Catalina insiders admitted under oath that Catalina was no longer operating in the traditional sense, that it did not have access to the proceeds of the Second Sale, that those proceeds were controlled by shareholders or related entities, and that Catalina received, at most, interest payments, while it struggled to pay ordinary course obligations, including credit card debt incurred in Ms. Day's name.[1] [AUMF No. 49].

---

[1] The testimony of Patrick Turner included the following:

"Q. Okay. Do you know why monies from the sale of assets would have gone into the control of the shareholders before the debts and other financial obligations of the company were paid?

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

## III. THE BURDEN IS ON CATALINA TO SHOW THERE IS NO DISPUTE AS TO ANY MATERIAL FACTS

Catalina has asserted that it wants to prevail on both its complaint and Ms. Day's counterclaim because "payment to Day is triggered only by the sale of the Butlers' shares of Catalina stock," and that "even if a sale of all, or substantially all, Catalina assets triggered payment, there was no sale of all or substantially all Catalina assets." [Doc. 122, 8:8-11]. Catalina maintains that "[t]he asset sales were not a sale of the Butler's [sic] shares of Catalina; they were not sales of all of Catalina's assets; they were not sale of 'substantially all' of Catalina's assets; and they were not even sales of all assets useful in the boat-building business." [Doc. 122, 15:7-10]. Catalina further contends that "Day's retirement alone did not trigger a bonus payment," that "there is no evidence that the Butlers sold their Catalina shares or that Catalina sold all of its assets, because neither event occurred," and that "[w]hether or not Catalina sold off its operating assets is an irrelevant consideration to the determination of whether a bonus payment was triggered." [Doc. 122, 19:2-6]. Catalina's counsel's assertion that, absent a stock sale, Sharon Day will never be paid her deferred compensation is tautologically infirmed. Over the course of sixty-one years of faithful service, Sharon Day earned her right to substantial deferred compensation,

---

A. I do not know why.
Q. And you needed the money for operations, right?
A. We needed it for – to prove the property and to continue the operations, yes.
Q. And to pay the credit card bills that Ms. Day was personally obligated on, right?
A. Correct."

the Bonus Compensation Agreement is patently unclear when that compensation is paid in the event the stock of Catalina is not sold, but instead, Catalina's assets, which provided the calculus for the deferred compensation, are sold. No employment contract providing for deferred compensation can be read, as Catalina's counsel would have this Court believe, such that Sharon Day may never receive her earned compensation. Moreover, irrespective of the date the compensation should have been paid, Catalina has engaged in at least two sets of substantial fraudulent transfers, affecting the payment of Ms. Day's compensation, which, in turn, creates additional bases for entry of a judgment in her favor. Catalina's motion for summary judgment is a push back to Ms. Day's prior filed motion for summary judgment and does nothing to prove its right to a judgment but rather supports Ms. Day's motion for summary judgment.

Summary judgment is appropriate only where the record, read in the light most favorable to the nonmoving party, indicates that there "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Id.* at 323.

The court "may grant summary judgment motions touching upon contract interpretation when the agreement is unambiguous." *S. California Gas Co. v. City of*

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

*Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (holding that a party can defeat summary judgment by showing evidence, when taken as a whole, could lead the trier of fact to finds in its favor). "Whether a contract provision is ambiguous is a question of law. If it is, ordinarily summary judgment is improper because differing views of the intent of parties will raise genuine issues of material fact. Under California law, a party may present extrinsic evidence to show that a facially unambiguous contract is susceptible of another interpretation." *Maffei v. N. Ins. Co. of New York*, 12 F.3d 892, 898 (9th Cir. 1993) (cleaned up); *see also In re Med. Capital Sec. Litig.*, 2013 WL 1344969, at *3 (C.D. Cal. Apr. 2, 2013) (when a court finds that a part of a contract is ambiguous, it should ordinarily be hesitant to grant summary judgment). Here, Catalina's president both admitted Sharon Day earned and was due her deferred compensation by unquestionably meeting the service requirements, which were unambiguous, and then admitted that  the timing provisions of the Bonus Compensation Agreement are both "confusing" and "unclear." [AUMF Nos. 50, 51].

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

## IV.    CATALINA IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS DECLARATORY RELIEF CLAIM.

### A. **Catalina's Motion Depends Upon Disputed Facts About Asset Retention and Proceeds.**

Catalina's central factual premise—that it retained between $25 and $30 million in assets—is squarely contradicted by sworn testimony.  [Doc. 121, 13:16-17].

Multiple witnesses testified that the most valuable asset—the Salt Creek Property—was sold for $12.5 million, that Catalina did not control or receive the proceeds, and that insiders diverted those proceeds to affiliated entities or investments.  [AUMF No. 45].

Patrick Turner, former employee, Chief Operating Officer, and President of Catalina, testified that the Salt Creek property ultimately sold for $12.5 million to Prometheus Maritime Properties and that this amount is consistent with the documentary stamp tax calculations. [AUMF No. 45, Turner Dep. 105:8-109:12]. Turner further testified that those sale proceeds were placed in an account Catalina did not control, and shareholders or a related entity controlled the funds, at a time when the operating business was having cash flow problems.[2]  [AUMF No. 45, Turner Dep. 105:8-109:12].

---

[2] The testimony of Patrick Turner included the following:
"Q. Okay.  And that money, I think you testified, was transferred to some accounts that Catalina Yachts didn't have access to, but the shareholders of Catalina Yachts, Inc. had access to?

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

Critically, Catalina received only interest on those proceeds—approximately $60,000 to $65,000 per month, and only "when we asked for it." [AUMF No. 45, Turner Dep. 108:6-108:10]. Turner admitted that the principal remains elsewhere and that he was not aware of any payment made back to Catalina for the $12.5 million taken by either the shareholders of Catalina Yachts, Inc. or the shareholders of Catalina Investments, LLC. [AUMF No. 45, Turner Dep. 105:8-109:12].

Keith Lichtman, former controller for Catalina, corroborated that the Salt Creek proceeds were not used for Catalina's operations and that no purchases from those proceeds helped Catalina's operations. [AUMF No. 45, Lichtman Dep. 32:6-10; 35:2-22]. Lichtman further testified that, at the time of the Salt Creek Sale, Catalina was having "financial difficulty" and could not pay its obligations in the ordinary course. [AUMF No. 45, Lichtman Dep. 32:17-21].

Additionally, Catalina admits it also sold the church property for $1,000,000 and the operations for $2,425,000 in a note and debt assumption leaving Catalina with no real operations. [AUMF No. 44, 46, 49]. It is undisputed that Catalina failed to set aside any of the $15,925,000 in sales proceeds and other consideration to pay Sharon Day at least her 5% on those sales and that Catalina deprived its creditors of access to such proceeds. [AUMF No. 52].

---

A. Yes.
Q. And this was done at a time where the business was having cash flow problems, right?
A. Yes."

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

Multiple witnesses testified that the Reardon transaction involved the sale of all or substantially of all of Catalina's operating assets.  [AUMF 55; Turner Dep. 18:21-19:1[3]; Reese Dep. 73:6-9[4]; Bear Dep. 23:17-24:11].  In its now-vacated Motion for Summary Judgment (Doc. 84), Catalina stated,

> Had Catalina essentially hypothetically hollowed itself out by selling Reardon all of its assets, that would be a far different situation.  But Catalina only sold approximately 10% of its assets and Catalina itself retained those sales proceeds.

Doc. 84, 15:3-5.  The sworn testimony establishes that this is not a hypothetical at all, but rather what occurred in fact.  For example, Nancy Bear, daughter of Frank and Jean Butler, testified as follows,

> Q.    After the sale of the church property, the Salt Creek property, and the business sale to Michael Reardon, did Catalina Yacht, Inc., still own anything?
>
> A.    Not that I'm aware of.

[AUMF No. 55, Bear Dep. 24:8-11].  At minimum, there is a triable issue as to whether Catalina, in economic reality, sold or stripped itself of substantially all

---

[3] Turner testified as follows:
Q. Did there come a point in time when the company decided to sell its assets?
A.  It was February of '24, and it decided to start shutting down the company, the operations.
Q. And who made that decision?
A. Russell Berney.
[4]  Reese testified as follows:
Q. So a million-dollar note plus an assumption of $1,425,000 was the consideration he paid for the Catalina assets?
A. Yes.

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

meaningful value while avoiding and refusing to honor its undisputed obligation to

pay Ms. Day under the Agreement.

B. **The Agreement is Reasonably Susceptible to Ms. Day's Interpretation**.

California adopts a "permissive approach to extrinsic evidence in contract

interpretation," under which "[t]he test of admissibility of extrinsic evidence to

explain the meaning of a written instrument is not whether it appears to the court to

be plain and unambiguous on its face, but whether the offered evidence is relevant to

prove a meaning to which the language of the contract is reasonably susceptible."

*Barris Indus., Inc. v. Worldvision Enters., Inc.*, 875 F.2d 1446, 1450 (9th Cir. 1989)

(internal citations omitted). Catalina contends that "[t]here is simply no possibility

that parol evidence would show that the asset sales triggered Day's right to payment

because the [Agreement] is not reasonably susceptible to that interpretation." [Doc.

122, 17:1-10]. However, as demonstrated in Ms. Day's Renewed Motion for

Summary Judgment, the Agreement is plainly susceptible to Ms. Day's reading.

Indeed, it is Catalina's interpretation, not Ms. Day's, that produces untenable results:

rendering contractual promises illusory and permitting one party to unilaterally

defeat earned compensation. Under Catalina's construction, a guaranteed deferred

compensation obligation would be reduced to an optional gratuity, payable only at

Catalina's discretion depending upon whether it elected a stock sale over asset sales.

That outcome cannot be reconciled with the Agreement's text, structure, or purpose.

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

California law does not recognize a category of earned compensation that may be acknowledged in perpetuity yet never ripen or give rise to an enforceable obligation. *See Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509, 522-23 (2006).

The Agreement's own provisions confirm this susceptibility. The Agreement defines "Sale of Catalina" to include a sale of assets, not merely stock. [UMF No. 7]. The Agreement further ties payment to consideration received by shareholders, yet Catalina structured transactions so that shareholders or affiliates received value while the operating company did not. Catalina's current President admitted that the Agreement is "confusing" and "unclear" when assets are sold in pieces or through affiliates. [AUMF Nos. 50, 51]. That admission alone establishes that the Agreement is reasonably susceptible to more than one interpretation, requiring a trier of fact to interpret when Catalina should have paid Ms. Day her deferred compensation.

California law permits courts to determine ambiguity as a threshold legal question. Where, as here, contractual provisions pull in different directions and are reasonably susceptible to competing interpretations, ambiguity exists as a matter of law, and parol evidence is admissible to resolve it. *Smith v. Simmons*, 638 F. Supp. 2d 1180, 1193 (E.D. Cal. 2009) ("A contract provision is ambiguous when it is capable of two or more constructions both of which are reasonable."); *see also Seoul Semiconductor Co., Ltd. v. Finelite, Inc.*, 694 F. Supp. 3d 1199, 1209 (N.D. Cal. 2023) (the determination of whether parol evidence should be admitted is a two-step

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

process that first requires a court to provisionally receive all credible evidence regarding the parties' intentions and, if the court decides the contract is reasonably susceptible to the urged interpretation, extrinsic evidence is admitted to aid in interpreting the contract).  The Agreement is at minimum reasonably susceptible to Ms. Day's interpretation as to the timing of the deferred compensation.  This Court should therefore admit parol evidence to determine the parties' intended meaning.

### C. No "Appeal to Equity" Would Be Undermined by Any Rescission of the Reardon Transaction.

Under Section C of its Motion, Catalina contends that "any appeal to the equities vanishes entirely when the aftermath of the Reardon Transaction is considered," and that "Catalina is not depriving Day of the proceeds of a completed transaction." [Doc. 122:17-18-23].  Ms. Day, however, does not rely on a generalized "appeal to equity," nor does any part of her claim depend upon whether the Reardon transaction ultimately succeeded.  The relevant inquiry is the nature of the transaction at the time it was undertaken.  Moreover, the issue is the cumulative effect of the First Sale, the Salt Creek Sale, and the Third Sale, not just the Third Sale in isolation.

In April 2025, Catalina entered into a binding Asset Purchase Agreement and transferred substantially all of the remaining Catalina assets and operations in exchange for a $1 million promissory note and the assumption of approximately $1.425 million in liabilities.  When Reardon failed to perform, Catalina obtained a final default judgment for possession of the subject property and a judicial default

judgment on three counts of its complaint. *See Catalina Yachts, Inc. v. Michael Reardon*, No. 25-005251-CI (Fla. 6th Jud. Cir., Pinellas Cnty.). Reardon's asserted default on the Asset Purchase Agreement does not defeat Ms. Day's claims. Furthermore, Catalina sued Reardon for damages, not to unwind the transaction. It left the sale in place and pursued monetary remedies for breach.

## V.    EACH OF MS. DAY'S COUNTERCLAIMS PRESENTS GENUINE ISSUES OF MATERIAL FACT.

### A.    Breach of Contract

Catalina's breach theory depends upon the premise that no triggering sale event occurred. The record, however, reflects multiple asset sales totaling well over $15,925,000 after Ms. Day's right vested, including sales Catalina insiders themselves characterized as the disposition of operating assets.

Whether those transactions trigger payment under the Agreement now—or whether Catalina deliberately structured them to avoid payment—is the quintessential fact question. Moreover, what relief should be afforded by this Court on account of Catalina's bad faith conduct in trying to structure transactions to avoid payment of admitted creditors only to favor shareholders remains open.

### B.    Breach of Implied Covenant of Good Faith and Fair Dealing

Catalina contends, *inter alia*, that "the implied covenant cannot create an obligation that the [Agreement] does not impose." [Doc. 121, 20:16-17]. However,

even if we were to accept Catalina's self-serving interpretation of the timing provisions of the Agreement, California law does not permit a party to invoke contractual discretion as a mechanism to defeat bargained-for compensation.

In *McCollum v. XCare.net, Inc.*, 212 F. Supp.2d 1142 (N.D. Cal. 2002), the employer argued that it complied with the written terms of a commission plan because the plan permitted reassignment of accounts and forfeiture of commissions before payment. The court denied summary judgment, explaining "if one party exercises its discretionary authority in bad faith for the purpose of frustrating the other party's legitimate expectations, it has breached the implied covenant." *Id.*, at 1152. Accordingly, even where a contract grants discretion, a breach occurs when that discretion is used in bad faith to eliminate compensation the counterparty reasonably expected to receive. No California employee's compensation should be avoided because the employer can play games with events which affect the timing of payment. *See Neisendorf*, 143 Cal. App. 4th at 522-23.

The same principle applies here. Even if Catalina's self-serving contractual interpretation were accepted, a jury could readily find that Catalina, who unquestionably owes Sharon Day her deferred compensation, frustrated the purpose of the Agreement by: (a) transferring valuable assets to insider affiliates for no consideration; (b) withholding sale proceeds, including those from the Salt Creek Sale, from Catalina at a time when it was unable to pay its creditors; and (c) expressly

Shumaker, Loop & Kendrick, LLP
Attorneys at Law
Tampa

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

revising the Reardon transaction to ensure the obligation to Ms. Day was not assumed, while simultaneously representing that Catalina "was aware of and would pay the obligation to Ms. Day." [AUMF Nos. 45, 49, 52, 56]. That conduct independently defeats summary judgment on the implied covenant claim. In California, "every contract contains an implied covenant of good faith and fair dealing whereby no party will do anything to injure the right of any other to receive the benefits of the agreement, and each will do everything that the contract presupposes that he will do to bring the bargain to fruition." *Ohashi v. Verit Indus.*, 536 F.2d 849, 853 (9th Cir. 1976). The record reflects that Catalina, through the First Sale, the Second Sale, and the Third Sale, indeed "hollowed itself out." Doc. 84, 15:3.

## C.   Promissory Estoppel

Catalina makes the following arguments, regarding Frank and Jean Butler and other Catalina shareholders' representations that Day would receive her deferred compensation either upon retirement or the sale of Catalina assets, Doc. 122:

(1)   "not a clear and unambiguous promise because it would require extrinsic evidence just to explain it";

(2)   "not a promise on which Day reasonably could rely because it is not consistent with the terms of the integrated [Agreement]"; and

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

(3)    "Day cannot rely on mere allegations; she needs evidence and she has none."

The record shows otherwise.  Ms. Day has presented evidence that Catalina's principals and counsel repeatedly acknowledged the obligation and promised payment, including during retirement discussions and asset-sale negotiations. [AUMF No. 56].  Those representations constitute evidence from which a factfinder could conclude that Catalina understood the Agreement to require payment and communicated that understanding to Ms. Day.  Furthermore, even accepting Catalina's counsel's self-serving interpretation of the Agreement (and Ms. Day does not), an oral modification to a written agreement can be sufficient to establish estoppel.  *See, e.g., Garcia v. World Sav., FSB*, 183 Cal. App. 4th 1031 (2010).

Catalina's argument improperly asks this Court to draw all inferences in its favor.  At summary judgment, this Court must view the evidence in the light most favorable to Ms. Day, and the existence, meaning, and effect of these representations are questions of fact and cannot be resolved as a matter of law on this record.

## D.    Fraudulent Transfer

Under both Cal. Civ. Code § 3439.04(a) and Fla. Stat. § 726.105(1)(a), a transfer is voidable as to a creditor if the debtor made the transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor."

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

- 24 -

Cal. Civ. Code § 3439.04 and Fla. Stat. § 726.105 each identify eleven nonexclusive factors—commonly referred to as "badges of fraud"—that may be considered in determining actual intent.  At least seven of those factors are present here, including:

(1) a transfer to an insider in connection with the Salt Creek Transfers;

(2) the absence of consideration received by Catalina for the Salt Creek Transfers;

(3) the transfer of substantially all of Catalina's operating assets through the First Sale, the Salt Creek Transfers, and Third Sale;

(4) concealment and/or sequestering of proceeds;

(5) the pendency of known obligations to Day during the First Sale, Salt Creek Transfers, and Third Sale;

(6) Catalina's insolvency or inability to pay debts as they came due; and

(7) Catalina's retention of control over assets through an affiliated transferee in the Salt Creek Transfers.

First, it is undisputed that, in July 2024, Catalina, for no consideration, transferred the Salt Creek Property to Catalina Investments, LLC, a newly created entity controlled by the Catalina shareholders, which is not subject to the obligation to pay Ms. Day her deferred compensation, who, in turn, then sold that property to Prometheus Maritime Properties for approximately $12,500,000.00, without using any of those sale proceeds to fund Catalina's operations and without providing for payment to outstanding creditors, including Ms. Day.  [AUMF No. 45].  These facts

unquestionably establish multiple badges of fraud, including a transfer to an insider, lack of consideration, and retention of control through an affiliated entity. "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Kaisha v. Dodson*, 423 B.R. 888, 901 (N.D. Cal. 2010) (quoting *In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994)).

Second, none of the sale proceeds from the Salt Creek Transfers were used to support Catalina's operations or to pay creditors, including Ms. Day. [UMF No. 45]. In a recent deposition, Patrick Turner, Catalina's former employee, Chief Operating Officer, and President, testified:

i.   Confirming that "either the shareholders of Catalina Yachts, Inc. or the shareholders of Catalina Investments, LLC, which is a related company, took $12,500,000 that was the purchase proceeds related to the property that Catalina Yachts, Inc. owned." [AUMF No. 45, Turner Dep., 108:25-109:6].

ii.  That he is not "aware of" any payment "from the shareholders of Catalina Yachts, Inc. or this related company, Catalina Investments, LLC" "for the $12,500,000 they took from Catalina." [AUMF No. 45, Turner Dep., 109:7-12].

iii. That Catalina "needed [the proceeds from the Salt Creek Transfers] … to continue the operations." [AUMF No. 45, Turner Dep., 39:3-6].

iv.  Confirming that "instead of using the money to pay [Catalina's]

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

obligations and improve the assets, the monies went to the control of the shareholders." [AUMF No. 45, Turner Dep. 39:10-13].

v. Confirming that the proceeds from the Salt Creek Transfers were needed "to pay the credit card bills that Day was personally obligated on…" [AUMF No. 45, Turner Dep., 39:7-9].

Similarly, Keith Lichtman, former controller at Catalina, recently testified:

i. Confirming that the proceeds from the Salt Creek Transfers "were not used for [Catalina's] operations." Lichtman Dep., 32:6-10.

ii. That, at the time of the Salt Creek Transfers, Catalina was "having financial difficulty" and "not financially functioning like [Catalina] had during the COVID years." [AUMF No. 45, Lichtman Dep., 32:17-33:1].

iii. Confirming that Catalina was not "able to pay all of its financial obligations in the ordinary course at the point in time when it sold the Salt Creek property." [AUMF No. 45, Lichtman Dep. 32:17-33:1].

iv. Confirming that "Catalina Investments took the cash that belonged to Catalina Yachts and bought more property with it in a 1031 exchange." [AUMF No. 45, Lichtman Dep., 35:11-14].

v. Confirming that "no purchases" were made "that helped Catalina Yachts in its operations" from the proceeds from the Sale Creek Transfers. [AUMF No. 45, Lichtman Dep., 35:20-22].

vi. Confirming that, to his knowledge, none of the proceeds from the Salt Creek Transfers were "set aside to pay Sharon Day her retirement monies" and that "when the sale of the Catalina Yachts' assets to Mr. Reardon's new company occurred," no money was "set aside to pay the retirement obligations owed to Sharon Day." [AUMF No. 45, Lichtman

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

Dep., 28:8-12; 30:25-31:6].

This testimony confirms that none of the sale proceeds from the Salt Creek Transfers were used to fund Catalina's operations or to satisfy its creditor obligations, including those owed to Sharon Day.

Third, Ms. Day was a known creditor at the time of the Salt Creek Transfers. Catalina's own testimony establishes that "for sure [Ms. Day has] reached [the Agreement's 'when bonus is earned' requirements] because she worked over the seven and a half years…" [AUMF No. 48].

Fourth, the combined effect of the First Sale, the Salt Creek Transfers, and the Third Sale involved substantially all of Catalina's operating assets and rendered Catalina insolvent.  In a recent deposition, Patrick Turner testified that it was "decided to start shutting down the company, the operations" in February 2024. [AUMF No. 55, Turner Dep., 18:21-24].  Marc Reese, testified that the Third Sale involved "the sale of the assets of Catalina Yachts."  [AUMF No. 55, Reese Dep., 24:9-13].  Mr. Reese further testified, with respect to the Third Sale, as follows:

> Q.    Okay.  So let me ask you this: Was Catalina sold?
> A.    Was Catalina sold?
> Q.    Yes.
> A.    The assets were sold.

[AUMF No. 55, Reese Dep., 45:10-14].  In recent deposition, Nancy Bear, daughter of Frank and Jean testified as follows:

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

Q.     Okay.  **Do you know if any of the $12,500,000 from the Sale Creek sales proceeds were set aside to pay Sharon Day her bonus?**

A.     **No.**

Q.     You don't know one way or the other, or you know that they were not?

A.     I'm not aware of anything being put aside, no.

Q.     Okay.  Did you hear that Catalina Yacht[s], Inc., sold its business operations to a person named Michael Reardon?

A.     Yes.

Q.     Okay.  What do you know about that transaction?

A.     Nothing.

Q.     Okay.  Do you know it happened in 2025?

A.     Would you – that's a vague question.  What do you mean?

Q.     **Did you know Catalina Yacht[s], Inc. sold its business operations to Michael Reardon in the spring of 2025?**

A.     **Yes.**

Q.     And what do you know about the transaction?

Mr. Lieb:     It's been asked and answered.  Go ahead.

A.     I just know it was sold.

Q.     Okay. **Do you know what was sold?**

A.     **Just Catalina Yachts.**

…

Q.     After the sale of the church property, the Salt Creek property, and the business sale to Michael Reardon, did Catalina Yacht(s), Inc., still own anything?

A.     Not that I'm aware of.

[AUMF No. 55, Bear Dep., 23:1-24:11 (emphasis added)].

According to, *inter alia*, the testimony of Catalina insiders: at the time of the Salt Creek Transfers, Catalina was no longer operating in the traditional sense; Catalina did not have access to the proceeds of the Salt Creek Transfers; those proceeds were controlled by shareholders or related entities; and Catalina received, at most, interest payments, while it struggled to pay ordinary course obligations, including Catalina credit card debt incurred in Ms. Day's name. [AUMF No. 45].  It

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

is beyond peradventure that these badges of fraud establish an actual intent to hinder, delay or defraud creditors and do exactly what Catalina's counsel told this Court, namely that the assets could be sold off and Ms. Day would not be paid unless and until the stock was sold, an event Catalina could avoid ever accomplishing denying Sharon Day of her earned compensation.

In *Kaisha v. Dodson*, the court found an actual fraudulent transfer under Cal. Civ. Code § 3439.04(a)(1) based upon the confluence of badges of fraud similar to those present here. *Kaisha*, 423 B.R. 888 (N.D. Cal. 2010). In *Kaisha*, the court held that a debtor's transfer to an insider, for no or inadequate consideration, while insolvent and facing known creditor obligations, and coupled with concealment and retention of control, constituted conclusive evidence of actual intent to hinder, delay, or defraud creditors. 423 B.R. at 901-02. The court emphasized that while a single badge of fraud may raise suspicion, "the confluence of several can constitute conclusive evidence of actual intent," absent clear evidence of a legitimate supervening purpose. *Id.* at 901 (quoting *In re Acequia, Inc.*, 34 F.3d 800, 806) (9th Cir. 1994)).

Here, as in *Kaisha*, Catalina transferred very substantial assets to an insider-controlled entity for no consideration, at a time when it was insolvent or becoming insolvent, while owing known obligations to Ms. Day, concealed or sequestered the proceeds from creditors, and retained effective control over the transferred assets

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

through an affiliated entity.  As in *Kaisha*, Catalina has identified no "significantly clear" legitimate purpose that would overcome this overwhelming circumstantial evidence of fraudulent intent.  Accordingly, under the reasoning of *Kaisha*, the Salt Creek Transfers constitute actually fraudulent transfers as a matter of law.

Alternatively, the Salt Creek Transfers were constructively fraudulent under Cal. Civ. Code § 3439.04(a)(2) and/or § 3439.05 and Fla. Stat. § 726.105(1)(b) and/or § 726.106 because Catalina did not receive reasonably equivalent value in exchange for transferring the proceeds to an insider affiliate and: (a) was engaged in a business for which its remaining assets were unreasonably small, or (b) intended to incur, or reasonably should have believed it would incur, debts beyond its ability to pay as they became due, or (c) was insolvent or became insolvent as a result of the transfer(s).

In *United States v. May*, 600 F. Supp. 339, 341—42 (S.D. Cal. 1984), the United States moved for summary judgment to set aside a taxpayer's transfer of real property as a fraudulent conveyance under California's Uniform Fraudulent Conveyance Act.  Prior to the transfer, the court had entered judgment for federal income tax deficiencies and recognized federal tax liens against the defendant.  Seven days after stipulating in tax court to the deficiency, the defendant conveyed her interest in a San Diego property to her half-brother and co-owner.

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

The court held that "[a]fter the conveyance of her interest in the property, [the defendant] had no assets and an indebtedness of $35,000, according to her deposition testimony. The conveyance thus rendered [the defendant] insolvent." *Id.*, at 341 (internal citations omitted). The court further emphasized that "fairness of the consideration received is to be viewed from the creditor's perspective" and that the defendant "has testified, and the deed supports this testimony, that she received no consideration for the transfer." *Id.* (internal citations omitted). The court granted summary judgment, concluding that the transfer was constructively fraudulent as a matter of law because it rendered the debtor insolvent and lacked fair consideration, without regard to actual intent. *Id.* Here, as in *May*, Catalina received no consideration for the Salt Creek Transfers, was rendered insolvent or left unable to satisfy its obligations in the ordinary course of its operations, and placed the proceeds beyond the reach of Ms. Day, a known creditor, compelling a finding of constructive fraud as a matter of law.

The uncontroverted facts establish that the Salt Creek Transfers were made with actual intent to hinder, delay, or defraud Catalina's creditors, including Ms. Day, as evidenced by a confluence of badges of fraud—an insider transaction, the absence of consideration, the sequestration and control of proceeds by insiders and affiliated entities, the existence of a known creditor, and Catalina's insolvency or inability to pay obligations as they came due. Independently, and at a minimum, the same

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

undisputed record establishes constructive fraud because Catalina failed to receive reasonably equivalent value in exchange for the transfer and was insolvent or rendered insolvent, left with unreasonably small assets, and/or incurred debts beyond its ability to pay as they became due.  Accordingly, under both California and Florida law, there is no genuine dispute of material fact that the Salt Creek Transfers are voidable, and Ms. Day, and not Catalina, is entitled to judgment as a matter of law.

## VI.    MS. DAY'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT CONFIRMS THAT CATALINA'S MOTION FAILS.

Ms. Day's Motion for Partial Summary Judgment establishes that: (1) Ms. Day unquestionably earned her deferred bonus compensation, based on the terms and provisions of the Agreement and based upon Catalina's president's admissions, affording her a present or future right to payment of her bonus compensation [AUMF No. 48], and (2) as also admitted by Catalina's president, the Agreement is ambiguous as to timing [AUMF Nos. 50, 51], requiring consideration of parol evidence in its interpretation.  If this Court agrees with either proposition—as, *inter alia*, Catalina's own testimony supports—Catalina's Motion for Summary Judgment necessarily fails.

SHARON DAY'S OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090

## VII.  CONCLUSION

Catalina's lawyers ask this Court to ignore its own current and former officers' sworn testimony, disregard insider transactions, and adopt a contract interpretation that would permit Catalina to forever evade a vested compensation obligation to its longest tenured employee through asset-stripping and creative structuring.  Rule 56 does not permit that result.

Because genuine disputes of material fact exist as to Catalina's Motion for Summary Judgment—and because Ms. Day has affirmatively demonstrated entitlement to partial summary judgment—Catalina's Motion for Summary Judgment should be DENIED in its entirety.

Dated: February 23, 2026                SHUMAKER, LOOP & KENDRICK, LLP

                                                          Steven M. Berman
                                                          By: */s/ Steven M. Berman*
                                                          _____
                                                               Steven M. Berman
                                                               Attorney for SHARON DAY

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel for Sharon Day certifies that this brief contains approximately 6,859 words, which:

[x] complies with the word limit of L.R. 11-6.1.

[ ] complies with the word limit set by court order dated _____.


February 23, 2026                          */s/ Steven M. Berman*
                                           Steven M. Berman

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

SHARON DAY'S OPPOSITION TO
CATALINA YACHTS, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT
2:25-CV-04090