Shumaker, Loop & Kendrick, LLP
Steven M. Berman, Bar No. 256846
sberman@shumaker.com
101 East Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
Telephone:  813.229.7600
Facsimile:   813.229.1660

Attorneys for Defendant
Sharon Day

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CATALINA YACHTS, INC., a California Corporation, | Case No. 2:25-CV-04090-SVW-RAO |
| Plaintiff, | Assigned to The Hon. Stephen V. Wilson |
| v. | |
| SHARON DAY, an individual; GERARD DOUGLAS, an individual; and DOES 1 through 10, inclusive, | **SHARON DAY'S (1) STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN SUPPORT OF OPPOSITION TO CATALINA YACHTS, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT; AND (2) STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS** |
| Defendants | |
| GERARD DOUGLAS, | |
| Plaintiff | |
| v. | Date: March 16, 2026 |
| CATALINA YACHTS, INC., a California Corporation, RUSSELL BERNEY, as Trustee, JEAN C. BUTLER, as Trustee, MICHAEL REARDON, an individual, and ROES 1 through 5, as Trustees, inclusive, | Time: 1:30 p.m. Courtroom 10A |
| Defendants. | Action Filed: May 7, 2025 Trial Date: April 21, 2026 |
| and | |

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

- 1 -

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

1

2  SHARON DAY,

3  Counterclaim Plaintiff,

4  v.

5  CATALINA YACHTS, INC.,
   a California Corporation,

6

7                         Counterclaim Defendant.

8

9

10       Defendant/Counter-Plaintiff Sharon Day ("Ms. Day") hereby submits the

11  following  response  to  Plaintiff/Counter-Defendant  Catalina  Yachts,  Inc.'s

12  ("Catalina") Statement of Uncontroverted Facts in Support of Motion for Summary

13  Judgment.

14       **SHARON DAY'S RESPONSES TO CATALINA'S PURPORTED**
       **UNCONTROVERTED MATERIAL FACTS**
15

16

| Moving Party's Uncontroverted Facts | Moving Party's Supporting Evidence | Sharon Day's Response and Supporting Evidence |
|---|---|---|
| 1.  Sharon Day signed the Bonus Compensation Agreement ("BCA") on or about November 18, 2002. | Declaration of Michael C. Lieb ("Lieb Decl."), ex. 3, BCA. | Undisputed. |
| 2.  The BCA states that Day will be paid a bonus equal to the greater of $1 | Lieb Decl., ex. 3, BCA §§ 1.2(i) and 1.4 (page 3 of 5). | Disputed.  Mischaracterizes the Agreement by failing to account for provisions governing an asset-sale scenario.  Ms. Day disputes that this provision limits her right to be paid her deferred |

27

28

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

| | | compensation. The Agreement must be read as a whole, and Section 1.3 independently provides that if Catalina sells all or substantially all of its assets, Day is entitled to 5% of the net proceeds. The Agreement is ambiguous as it relates to the timing of the payment of her deferred compensation, along with associated interest, penalties, fees, and costs now due. That position is supported by, *inter alia*, Catalina's representative's testimony that "the way [the Agreement] is written up is a little unclear in certain areas" and that the Agreement is "confusing." Catalina's representative further testified that in a scenario where Catalina sells its assets without the Butlers selling their shares, the timing of Ms. Day's deferred compensation payment is "part of the confusing part about the document." |
|---|---|---|
| million or 5% of the "net sales price" received by the Catalina shareholders on a sale of their shares of stock. | | |
| | | **Supporting Evidence** Berman Decl., Ex. 1, 49:16-20; 51:8-19; Ex. 7, BCA. |
| 3. Section 1.1 of the BCA states: "1.1. When Bonus is Earned. Employee shall earn the Bonus if Employee continues to work full-time for Catalina until the earlier of: (i) the sale of Catalina; or (ii) seven and one-half (7-1/2) years from the date of execution of this Agreement." | Lieb Decl., ex. 3, BCA § 1.1 (page 2 of 5). | Undisputed that the Agreement states this. |

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

| | | |
|---|---|---|
| 4. Day remained employed by Catalina for more than 7 ½ years after she signed the BCA. | Lieb Decl., ex. 2, Amended Answer and Counterclaims of Defendant Sharon Day ("Day Counterclaim"), ¶¶ 17, 24. | Undisputed. |
| 5. Day "earned" her bonus when she continued to work for Catalina for an additional 7 ½ years after signing the BCA on November 18, 2002. | Lieb Decl., ex. 3, BCA § 1.1 (page 2 of 5); Lieb Decl., ex. 2, Day Counterclaim, ¶¶ 17, 24. | Undisputed.<br><br>Supporting Evidence<br><br>Berman Decl., Ex. 7, § 1.1; *see*<br><br>Berman Decl., Ex. 1, 49:6-12. |
| 6. Day also could have earned her bonus if a "Sale of Catalina" had occurred before 7 ½ years after signing the BCA on November 18, 2002. | Lieb Decl., ex. 3, BCA § 1.1 (page 2 of 5). | Undisputed. |
| 7. "Sale of Catalina" is defined in the BCA to "include[] sale of the Butlers' stock or sale of all of Catalina's assets." | Lieb Decl., ex. 3, BCA § 1.1 (page 2 of 5). | Undisputed. |
| 8. There was no Sale of Catalina prior to May 18, 2010. | Reese Decl., ¶ 5. | Undisputed, but irrelevant. |

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS
2:25-CV-04090

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

| | | |
|---|---|---|
| 9. Day retired from Catalina on December 2, 2024. | Lieb Decl., ex. 2, Day Counterclaim, ¶ 24. | Undisputed that Ms. Day retired in December 2024. |
| 10. Section 1.5 of the BCA states: "1.5. Timing of Payments. Catalina agrees to pay the Bonus to Employee within sixty (60) days of payment to the Butlers of the consideration they are to be paid for their shares. If the consideration, or part of it, paid to the Butlers is in the form of the buyer's securities, Catalina or its acquirer shall convey to Employee five percent (5%) of the securities to be delivered to the Butlers." | Lieb Decl., ex. 3, BCA § 1.5 (page 3 of 5). | Undisputed that Section 1.5 contains this language. However, Ms. Day disputes that this provision limits her right to be paid her deferred compensation. The Bonus Compensation Agreement ("Agreement") must be read as a whole, and Section 1.3 independently provides that if Catalina sells all or substantially all of its assets, Day is entitled to 5% of the net proceeds. The Agreement is ambiguous as it relates to the timing of the payment of her deferred compensation, along with associated interest, penalties, fees, and costs now due. That position is supported by, *inter alia*, Catalina's  representative's testimony that "the way [the Agreement] is written up is a little unclear in certain areas" and that the Agreement is "confusing."  Catalina's representative further testified that in a scenario where Catalina sells its assets without the Butlers selling their shares, the timing of Ms. Day's deferred compensation payment is "part of the confusing part about the document."<br><br>Supporting Evidence<br><br>Berman Decl., Ex. 1, 49:16-20; 51:8-19;<br><br>Ex. 7, BCA. |
| 11. Section 1.6 of the BCA states that if payment for the Butlers' shares was to be made over time, | Lieb Decl., ex. H, BCA § 1.6. | Undisputed only to the extent Section 1.6 of the Agreement speaks for itself and states:<br><br>"This paragraph applies if the monetary portion of the compensation to be paid for the Butlers' Catalina shares is not paid in a lump sum. Catalina shall pay to |

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS
2:25-CV-04090

| | | |
|---|---|---|
| Day would be paid as the Catalina shareholders received their payments, provided that the full bonus was to be paid within five years. | | Employee five percent (5%) of the period payment(s) that are to be paid to the Butlers, or their successors in interest, for their shares as they are paid. Despite the length of time over which the Butlers receive periodic payments, all cash payments to be paid to Employee shall be fully paid no later than five (5) years after the beginning of periodic payments." |
| | | Otherwise, the Agreement is ambiguous as it relates to the timing of the payment of her deferred compensation, along with associated interest, penalties, fees, and costs now due. That position is supported by, *inter alia*, Catalina's representative's testimony that "the way [the Agreement] is written up is a little unclear in certain areas" and that the Agreement is "confusing." Catalina's representative further testified that in a scenario where Catalina sells its assets without the Butlers selling their shares, the timing of Ms. Day's deferred compensation payment is "part of the confusing part about the document." |
| | | Supporting Evidence |
| | | Berman Decl., Ex. 1, 49:16-20; 51:8-19; Ex. 7, BCA. |
| 12. The "Butlers" are defined in Recital C of the BCA as nine separate trusts that collectively owned all the shares of Catalina stock when the BCA was signed. | Lieb Decl., ex. 3, BCA Recital C (page 2 of 5); Reese Decl., ¶ 4. | Undisputed that Agreement states "Reference in this Agreement to 'Butlers' are intended to be to [nine separate] trusts as a group." Supporting Evidence Berman Decl., Ex. 7, BCA, Recitals. |
| 13. From the date of the BCA through today, none of | Reese Decl., ¶ 4. | Disputed. Catalina cites no admissible evidence establishing this fact. |

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS
2:25-CV-04090

| | | |
|---|---|---|
| the Butlers have sold any of their shares of Catalina. | | |
| 14. Catalina currently owns the following assets: (1) 100% of the membership interests in Catalina Investments, LLC, which owns property interests it acquired in a tax-free Rule 1031 exchange of real property worth $12.5 million; and (2) real estate in Florida ("Florida Properties") with an appraised value of $13,080,000. | Reese Decl., ¶ 6. | Undisputed that after the Reardon Transaction, Catalina retained some assets in the form of some real property. Disputed as to the value of such property, which is based upon appraisals subject to cross-examination as to the qualifications of the appraiser, as well as the accuracy of the information relied upon and basis for conclusions. |
| 15. Catalina made the decision to enter into a tax-free Rule 1031 exchange of real property in order to acquire property that produced income that could be | Reese Decl., ¶ 6. | Undisputed that in July 2024, Catalina, for no consideration, transferred certain property located in Pinellas County, Florida, to Catalina Investments, LLC, a newly created entity controlled by the shareholders of Catalina, who then sold that property to Prometheus Maritime Properties for approximately $12.5 million, without using any of the sale proceeds to support necessary operations and without providing for payment to outstanding creditors including Ms. Day.<br><br>Supporting Evidence |

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

| | | |
|---|---|---|
| used to fund the expenses of Catalina. | | Berman Decl., Ex. 3; Berman Decl. Ex. 6, 28:8-12, 30:25-31:6, 32:6-10, 32:17-33:1, 33:11-35:14, 35:20-22; Berman Decl. Ex. 8, 18:21-19:1; 38:23-39:13; 105:8-109:12; Berman Decl., Ex. 9, 23:1-24:11. |
| 16. To facilitate the tax-free Rule 1031 exchange of real property, in 2024, Catalina transferred property located at 101 16th Avenue South, St. Petersburg, FL ("Salt Creek Property") to Catalina Investments. | Reese Decl., ¶ 6, 16, exs. A, B, D. | Undisputed that in July 2024, Catalina, for no consideration, transferred certain property located in Pinellas County, Florida, to Catalina Investments, LLC, a newly created entity controlled by the shareholders of Catalina, who then sold that property to Prometheus Maritime Properties for approximately $12.5 million, without using any of the sale proceeds to support necessary operations and without providing for payment to outstanding creditors including Ms. Day. Catalina Investments, the fraudulent transferee of Catalina, has no obligation to pay Catalina's creditors.<br><br>Supporting Evidence<br><br>Berman Decl., Ex. 3; Berman Decl. Ex. 6, 28:8-12, 30:25-31:6, 32:6-10, 32:17-33:1, 33:11-35:14, 35:20-22; Berman Decl. Ex. 8, 18:21-19:1; 38:23-39:13; 105:8-109:12; Berman Decl., Ex. 9, 23:1-24:11. |
| 17. Catalina Investments is Catalina's wholly owned subsidiary. | Reese Decl., ¶ 9. | Disputed. While Catalina may nominally own Catalina Investments, LLC, the evidence shows that Catalina Investments is controlled by Catalina's shareholders, not by Catalina as a corporate entity. The effect of the transfer was to place the Salt Creek Property and its proceeds under the control of insiders and beyond the reach of Catalina's creditors, including Ms. Day. In fact, Catalina's officers wanted to use some of the proceeds paid to Catalina Investments, to fund Catalina's creditors, including Ms. Day. Catalina's shareholders decided Catalina would not be permitted to use the sale proceeds to fund operations and pay its creditors, including Ms. Day.<br><br>Supporting Evidence |

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

| | | |
|---|---|---|
| | | Berman Decl., Ex. 3; Berman Decl. Ex. 6, 28:8-12, 30:25-31:6, 32:6-10, 32:17-33:1, 33:11-35:14, 35:20-22, Berman Decl. Ex. 8, 18:21-19:1; 38:23-39:13; 105:8-109:12; Berman Decl., Ex. 9, 23:1-24:11. |
| 18. In exchange for the transfer of the Salt Creek Property from Catalina to Catalina Investments, Catalina received 100% of the equity interest in Catalina Investments. | Reese Decl., ¶ 6, 16, exs. A, B, D. | Disputed. Receiving an "equity interest" in a shell entity controlled by insiders does not constitute reasonably equivalent value. The Salt Creek Property was sold for approximately $12.5 million and was Catalina's most valuable asset. After the Salt Creek Transfers, Catalina lost direct ownership and control of this asset, while receiving only a nominal interest in an entity that holds beneficial interests in Delaware Statutory Trusts. Moreover, Catalina's shareholders refused Catalina's officers' requests to use sales proceeds for operations and to pay creditors. Catalina's shareholders received the benefit of the fraudulent transfer, not Catalina and not Catalina's creditors, including Ms. Day. Finally, irrespective of any subsidiary status for Catalina Investments, there is no question that it received a transfer of the Salt Creek Property for no consideration and has no obligation to Catalina's creditors, including Ms. Day. <br><br> Supporting Evidence <br><br> Berman Decl., Ex. 3; Berman Decl. Ex. 6, 28:8-12, 30:25-31:6, 32:6-10, 32:17-33:1, 33:11-35:14, 35:20-22; Berman Decl. Ex. 8, 18:21-19:1; 38:23-39:13; 105:8-109:12; Berman Decl., Ex. 9, 23:1-24:11. |
| 19. At the time of the 2024 transfer from Catalina to Catalina Investments, the Salt Creek Property was not generating substantial | Reese Decl., ¶ 6. | Undisputed that the Salt Creek Property was not income-generating because the Salt Creek Property could have been sold directly by Catalina, with proceeds used to satisfy obligations to Catalina's creditors, including Ms. Day. <br><br> Supporting Evidence <br><br> Berman Decl., Ex. 3; Berman Decl. Ex. 6, 28:8-12, 30:25-31:6, 32:6-10, 32:17-33:1, 33:11-35:14, 35:20-22; Berman |

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

| income for Catalina. | | Decl. Ex. 8, 18:21-19:1; 38:23-39:13; 105:8-109:12; Berman Decl., Ex. 9, 23:1-24:11. |
|---|---|---|
| 20. Sharon Day was the President of Catalina when Catalina transferred the Salt Creek Property to Catalina Investments. | Reese Decl., ¶ 7, Day Counterclaim, ¶ 24 [Dkt. 116]. | Undisputed. However, Ms. Day was not a shareholder and did not control the decision to transfer the Salt Creek Property. That decision was made by Catalina's shareholders who stood to benefit from the Salt Creek Transfers at the expense of Catalina's creditors. |
| 21. Sharon Day signed the grant deed transferring the Salt Creek Property from Catalina to Catalina Investments, as well as an assignment agreement assigning the seller's rights in the transaction from Catalina to Catalina Investments. | Reese Decl., ¶ 10, exs. A, B. | Undisputed. However, Ms. Day was not a shareholder and did not control the decision to transfer the Salt Creek Property. That decision was made by Catalina's shareholder(s) who stood to benefit from the Salt Creek Transfers at the expense of Catalina's creditors. Catalina's representative confirmed that the direction regarding any sale would have come from a shareholder. On December 10, 2025, Catalina's representative testified as follows: Q. Right. And do you know who – who from the shareholders would have given [Ms. Day] direction with respect to a sale? A.     My assumption would be Jean Butler. Reese Dep., 63:22-64:7.  See **Exhibit A** attached hereto. |
| 22. At the time of the transfer from Catalina to Catalina Investments, Sharon Day did not raise any concerns about the transfer, nor did she claim that | Reese Decl., ¶ 10, exs. A, B, C. | Disputed. Catalina cites no admissible evidence establishing this fact. Also disputed as to materiality; Ms. Day's claims did not fully ripen until the Salt Creek Property was sold to Prometheus Maritime Properties, and Catalina failed to pay her deferred compensation. Ms. Day and David Day testified Ms. Day understood she would be paid upon retirement as the deferred compensation would be paid to her upon retirement from her sixty-one-year career with Catalina. |

| | | |
|---|---|---|
| the transfer triggered any rights under the BCA. | | |
| 23. In connection with the tax-free Rule 1031 exchange of real property, Catalina was guided by advice from its accountants who advised Catalina to transfer the Salt Creek Property to Catalina Investments and to have Catalina Investments handle the transfer. | Reese Decl., ¶ 9. | Ms. Day lacks sufficient information to admit or deny this fact.    However, reliance on an accountant's advice does not immunize a transfer from avoidance as a fraudulent conveyance. |
| 24. The purpose of the intermediate transfer of the Salt Creek Property from Catalina to Catalina Investments was to insolate any undisclosed liabilities associated with properties being acquired in the tax-free Rule | Reese Decl., ¶ 9. | Undisputed that the intermediate transfer occurred and that Catalina Investments then sold the Salt Creek Property to Prometheus Maritime Properties for $12.5 million and then invested the sales proceeds in some sort of tax free exchange that benefitted Catalina Investments and not Catalina. Catalina and its creditors, including Sharon Day, were deprived of the benefit of valuable assets that could have been used to pay Catalina's obligations. Instead, Catalina's shareholders, through a newly formed conduit, laundered the transfer and placed the value of the transfer one step away from Catalina's creditors. |

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

| | | |
|---|---|---|
| 1031 exchange of real property to Catalina Investments, thereby protecting Catalina from potential claims in excess of the value of the acquired properties. | | |
| 25. After the Salt Creek Property was transferred from Catalina to Catalina Investments, Catalina Investments, through an accommodator, sold the Salt Creek Property to Prometheus Maritime Properties, LLC ("Prometheus") for $12.5 million, generating net proceeds, after closing costs, prorations, etc., of $12,038,056.48. | Reese Decl., ¶¶ 9, 11, 16, ex. D. | Undisputed that in July 2024, Catalina, for no consideration transferred certain property located in Pinellas County, Florida, to Catalina Investments, LLC, a newly created entity controlled by the shareholders of Catalina, who then sold that property to Prometheus Maritime Properties for approximately $12.5 million, without using any of the sale proceeds to support necessary operations and without providing for payment to outstanding creditors including Ms. Day.<br><br>Supporting Evidence<br><br>Berman Decl., Ex. 3; Berman Decl. Ex. 6, 28:8-12, 30:25-31:6, 32:6-10, 32:17-33:1, 33:11-35:14, 35:20-22; Berman Decl. Ex. 8, 18:21-19:1; 38:23-39:13; 105:8-109:12; Berman Decl., Ex. 9, 23:1-24:11. |
| 26. In exchange for the sale of the Salt Creek | Reese Decl., ¶¶ 12, 16, ex. D. | Undisputed that Catalina Investments received those interests and that neither Catalina, nor its then current and future creditors received no value from such |

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS
2:25-CV-04090

| | | |
|---|---|---|
| Property from Catalina Investments to Prometheus, Catalina Investments received an undivided 23.587786% interest in real property located in Grambling, Louisiana ($6.18 million purchase price), and an undivided 7.295015% interest in two properties located in Oxford, Mississippi ($6.337 million purchase price). | | transfers. It is also undisputed that Catalina Investments never undertook nor is it obligated to any of Catalina's creditors, including Ms. Day. |
| 27. The Grambling property is a truck stop along Interstate 20 that receives reliable rental income from an Exxon and Truckstops of America retail location. | Reese Decl., ¶ 13. | Ms. Day lacks sufficient information to admit or deny this fact. However, if true, the circumstances of the transfer and the generation of income demonstrate the validity of Ms. Day's allegations and claims. In fact, if Catalina Investments had the ability to monetize the Salt Creek Property, the fact that Catalina was divested of the ability to realize cash flow from the sale of the Salt Creek Property is precisely why Catalina's shareholders should not have structured the sale of the Salt Creek Property as a fraudulent transfer from Catalina to Catalina Investments. |
| 28. The Oxford properties are two separate | Reese Decl., ¶ 14. | Ms. Day lacks sufficient information to admit or deny this fact. However, if true, the circumstances of the transfer and the generation of income demonstrate the |

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

| | | |
|---|---|---|
| apartment complexes near the University of Mississippi (Ole Miss). | | validity of Ms. Day's allegations and claims. |
| 29. The Gambling Property and the Oxford Properties are held for Catalina Investments in Delaware Statutory Trusts, which offer additional tax and asset protection advantages. | Reese Decl., ¶ 15. | Undisputed that Catalina Investments invested the Salt Creek sale proceeds in some sort of tax free exchange that benefitted Catalina Investments and not Catalina. Catalina and its creditors, including Sharon Day, were deprived of the benefit of valuable assets that could have been used to pay Catalina's obligations. Instead, Catalina's shareholders, through a newly formed conduit, laundered the transfer and placed the value of the transfer one step away from Catalina's creditors. The transfer also left Catalina insolvent. |
| 30. The Gambling and Oxford Properties acquired in the 1031 exchange were as valuable as the Salt Creek Property. | Reese Decl., ¶¶ 8, 11-14, ex. D. | Disputed as to materiality. The relevant question is whether Catalina received "reasonably equivalent value" in light of the creditors' rights and solvency and whether the transfer hindered or delayed a creditor. If Catalina Investments received reasonably equivalent value for its sale of Salt Creek Property actually confirms that the transfer of the Salt Creek Property from Catalina to Catalina Investments, for no consideration, was a quintessential fraudulent transfer. |
| 31. All income generated by the Gambling and Oxford Properties is used to fund the costs associated with operating Catalina. | Reese Decl., ¶ 16. | Disputed. In July 2024, Catalina, for no consideration transferred certain property located in Pinellas County, Florida, to Catalina Investments, LLC, a newly created entity controlled by the shareholders of Catalina, who then sold that property to Prometheus Maritime Properties for approximately $12.5 million, without using any of the sale proceeds to support necessary operations and without providing for payment to outstanding creditors including Ms. Day. If Catalina Investments shares some of its income with Catalina but refuses to allow the value of the Salt Creek |

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

| | | |
|---|---|---|
| | | Property to be made available for operations and to satisfy Catalina's then existing and future creditors makes the transfer fraudulent. |
| | | <u>Supporting Evidence</u> |
| | | Berman Decl., Ex. 3; Berman Decl. Ex. 6, 28:8-12, 30:25-31:6, 32:6-10, 32:17-33:1, 33:11-35:14, 35:20-22; Berman Decl. Ex. 8, 18:21-19:1; 38:23-39:13; 105:8-109:12; Berman Decl., Ex. 9, 23:1-24:11. |
| 32. No Catalina owner has ever received any money or other consideration from the 1031 exchange or the real property interests acquired through those exchanges. | Reese Decl., ¶ 16. | Disputed as to materiality, and Ms. Day is without sufficient knowledge to admit or deny this fact. Additionally, the above "facts" asserted by Catalina indicate that Catalina owners have received consideration and something of value as a result of these real property exchanges, which demonstrates an attempt to hide and/or fraudulently avoid paying its obligation to Ms. Day. |
| 33. In April 2025, Catalina agreed to sell certain of its assets to a buyer named Michael Reardon ("Reardon Transaction"). | Reese Decl., ¶ 17. | Undisputed only that in April 2025, Catalina and Michael Reardon executed a written purchase agreement concerning certain Catalina assets. Disputed to the extent this statement characterizes legal effect, enforceability, scope, or consummation of that agreement. |
| | | <u>Supporting Evidence</u> |
| | | Berman Decl., Ex. 4 |
| 34. The Reardon Transaction is memorialized in a document titled Asset Purchase Agreement dated April 23, 2025 and related | Lieb Decl., ex. I [Asset Purchase Agreement] | Undisputed. |

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS
2:25-CV-04090

| | | |
|---|---|---|
| documents therein. | | |
| 35. The Reardon Transaction was entered into because Catalina had made the business decision to discontinue building boats, which had become unprofitable. | Reese Decl., ¶ 18. | Disputed. Catalina cites no admissible evidence establishing that its motivation. Ms. Day has no personal knowledge of Catalina's reasons for the asset sale. |
| 36. In the Reardon Transaction, Catalina sold its name and certain equipment to Reardon while retaining the building used to build boats, the fixtures, and certain surrounding real property. | Reese Decl., ¶ 19; Lieb Decl., ex. I [Asset Purchase Agreement] | Undisputed that in April 2025, Catalina and Michael Reardon executed a written purchase agreement concerning certain Catalina assets. Disputed to the extent this statement characterizes legal effect, enforceability, scope, or consummation of that agreement. Supporting Evidence Berman Decl., Ex. 4. |
| 37. Reardon's consideration consisted of the assumption of $1.45 million in Catalina debt and a $1 million promissory note payable over three years. | Reese Decl., ¶ 19; Lieb Decl., ex. I [Asset Purchase Agreement, § 1.6] | Undisputed. |
| 38. The Reardon bid was selected in a | Reese Decl., ¶ 20. | Disputed. Catalina cites no admissible evidence establishing that fact. |

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

| | | |
|---|---|---|
| competitive bidding process as the most definitive and financially advantageous offer received by Catalina. | | |
| 39. Reardon made one payment of $4,166 under the $1 million promissory note associated with the transaction, and then defaulted. | Reese Decl., ¶ 21. | Ms. Day lacks sufficient information to admit or deny this fact. |
| 40. Since Reardon defaulted, Catalina has regained possession of the property leased to Reardon and is in the process of legal proceedings in Florida to recover the other purchased assets. | Reese Decl., ¶ 21. | Ms. Day lacks sufficient information to admit or deny this fact. Furthermore, Catalina's exercise of any option to regain possession—as opposed to compelling specific performance of the transaction—demonstrates its intention to avoid paying its admitted-obligation owed to Ms. Day. |
| 41. Catalina has not engaged in and is not engaging in any transaction intended to defraud its creditors, or leaving it with assets that are | Reese Decl., ¶ 22. | Disputed. All three sales were completed by disposing of without reserving monies for Ms. Day and all three sales interfered with her deferred compensation rights.<br><br>Supporting Evidence<br><br>Berman Decl., Ex. 2; Berman Decl., Ex. 3; Berman Decl. Ex. 6, 28:8-12, 30:25-31:6, 32:6-10, 32:17-33:1, 33:11-35:14, 35:20-22; Berman Decl. Ex. 8, 18:21- |

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

| | | |
|---|---|---|
| unreasonably small, nor has it incurred debts that it lacks sufficient assets to pay. | | 19:1;  38:23-39:13; 105:8-109:12; Berman Decl. Ex. 9, 23:1-24:11; Berman Dec., Ex. 1, 24:9-13, 45:10-14, 73:6-9; Ex. 4. |
| 42. Both the Sale Creek Transaction and the Reardon Transaction were intended to make Catalina more financially healthy. | Reese Decl., ¶ 22. | Disputed. None of the transactions were designed to benefit Catalina as a corporate entity; they were designed to benefit Catalina's shareholders at the expense of creditors like Ms. Day. All three sales were completed without reserving monies for Ms. Day and all three sales interfered with her deferred compensation rights. More importantly, Catalina's officers dispute this contention of counsel when they indicated they needed cash from the Salt Creek Transaction to fund Catalina's operations and pay existing and future creditors.<br><br>Supporting Evidence<br><br>Berman Decl., Ex. 2; Berman Decl., Ex. 3; Berman Decl. Ex. 6, 28:8-12, 30:25-31:6, 32:6-10, 32:17-33:1, 33:11-35:14, 35:20-22; Berman Decl. Ex. 8, 18:21-19:1;  38:23-39:13; 105:8-109:12; Berman Decl. Ex. 9, 23:1-24:11; Berman Dec., Ex. 1, 24:9-13, 45:10-14, 73:6-9; Ex. 4. |
| 43. The BCA states that it is a fully integrated document that can only be modified by a document in writing signed by the parties. | Lieb Decl., ex. H, BCA § IV. | Disputed.  The Agreement is ambiguous in that it provides for a payment mechanism in the eventuality of a stock sale, but does not address when the deferred compensation is paid in the eventuality of an asset sale even though an asset sale constitutes a triggering event for the payout.  The need to interpret when and how the payout occurs has nothing to do with integration.<br><br>Second, the parties have discussed and addressed payout following the execution of the document because of |

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

| | | the ambiguity. That is not a modification of the document. It is fixing an inherently confusing contractual structure. |
|---|---|---|

## SHARON DAY'S STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS

| | Sharon Day's Additional Uncontroverted Material Facts | Sharon Day's Supporting Evidence |
|---|---|---|
| 44. | The first sale of assets occurred in November 2020, when Catalina sold certain property located in Pinellas County, Florida, to Generation Church of Tampa Bay, Inc. for approximately $1,000,000.00. | Berman Decl., Ex. 2. |
| 45. | The second sale of assets occurred in July 2024, when Catalina, for no consideration, transferred certain property located in Pinellas County, Florida, to Catalina Investments, LLC, a newly created entity controlled by the shareholders of Catalina, who then sold that property to Prometheus Maritime Properties for approximately $12,500,000.00, without using any of the sale proceeds to support necessary operations and without providing for payment to outstanding creditors including Ms. Day. | Berman Decl., Ex. 3; Berman Decl. Ex. 6, 28:8-12, 30:25- 31:6, 32:6-10, 32:17-33:1, 33:11-35:22; Ex. 8, 18:21-19:1; 38:23-39:13; 105:8- 109:12; Ex. 9, 23:1-24:11. |
| 46. | The third sale of assets occurred in April 2025, when Catalina entered into an Asset Purchase Agreement (the "APA") with Michael Reardon (the "Buyer") for the sale of Catalina's assets | Berman Dec., Ex. 1, 24:9-13, 45:10-14, 73:6-9; Ex. 4. |

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

| | | in exchange for a $1,000,000.00 promissory note and the assumption of approximately $1,425,000.00 in liabilities. | |
|---|---|---|---|
| 47. | | "Bonus" is "additional compensation equal to five percent (5%) of the: (i) net sales price; or (ii) value of Catalina, whichever is appropriate," with a "Minimum Bonus" of "no less than one million ($1,000,000)" "if all conditions of [the] Agreement are satisfied." | Berman Decl., Ex. 7, §§ 1.2, 1.4. |
| 48. | | Catalina's president testified that "for sure [Ms. Day has] reached [the Agreement's 'when bonus is earned' requirements] because she worked over the seven and a half years…" | Berman Dec., Ex. 1, 49:6-12. |
| 49. | | Catalina insiders admitted, under oath, that Catalina was no longer operating in the traditional sense and that it did not have access to the proceeds of the Second Sale, that those proceeds were controlled by shareholders or related entities, and that Catalina received, at most, interest payments, while it struggled to pay ordinary course obligations, including credit card debt incurred in Ms. Day's name. | Berman Decl., Ex. 8, 18:21-19:1; 38:23-39:9; 105:8-109:12; Ex. 9, 23:17-24:11; Ex. 6, 32:6-10; 32:17-21; 33:11-35:10 |
| 50. | | Catalina testified that "the way [the Agreement] is written up is a little unclear in certain areas." | Berman Decl., Ex. 1, 49:16-20. |
| 51. | | Catalina testified that in a scenario where Catalina sells its assets without the Butlers selling their shares, the timing of Ms. Day's Bonus payment is "part of the confusing part about the document." | Berman Decl., Ex. 1, 51:8-19. |
| 52. | | Catalina sold off assets without addressing payment obligations. | Berman Decl., Ex. 1, 64:24-65:9, Ex. 6, 28:8-12; Ex. 8, 32:20-24; 39:10-13. |

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

| 53. | Catalina's current president testified that he was unaware that Catalina initiated this litigation against Ms. Day. | Berman Decl., Ex. 1, 37:6-20. |
| 54. | Ms. Day's right to her deferred compensation vested on or about May 18, 2010. | Berman Decl., Ex. 1, 49:6-12. |
| 55. | Multiple witnesses testified that the Reardon transaction involved the sale of all or substantially of all of Catalina's operating assets. | Berman Decl., Ex. 8, 18:21-19:1; Ex. 1, 24:9-13, 45:10-14, 73:6-9; Ex. 9, 23:1-24:11. |
| 56. | Catalina revised the Reardon transaction to ensure the obligation to Ms. Day was not assumed, while simultaneously representing that Catalina "was aware of and would pay the obligation to Ms. Day." | Berman Decl., Ex. 5; Ex. 10. |

Dated: February 23, 2026

SHUMAKER, LOOP & KENDRICK, LLP
Steven M. Berman

By: */s/ Steven M. Berman*
Steven M. Berman
Attorney for SHARON DAY

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

STATEMENT OF
GENUINE DISPUTES OF MATERIAL
FACT AND STATEMENT OF
ADDITIONAL UNCONTROVERTED
MATERIAL FACTS
2:25-CV-04090

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION


CATALINA YACHTS, INC., a
California Corporation,

         Plaintiff,

    vs.                 CASE NO. 2:25-CV-04090-SVW-RAO

SHARON DAY, an individual;
GERARD DOUGLAS, an individual;
and DOES 1 through 10,
inclusive,

         Defendants.
_____

AND RELATED CROSS-ACTIONS.
_____




RULE 30(b)(6) DEPOSITION OF CATALINA YACHTS, INC.,

THROUGH MARC REESE

APPEARING REMOTELY

December 10, 2025

12:38 p.m.



REPORTED STENOGRAPHICALLY BY:

Deborah L. Heskett

CVR, CSR No. 11797

APPEARING FROM SAN BERNARDINO COUNTY, CALIFORNIA

Marc Reese
December 10, 2025

```
 1   REMOTE APPEARANCES:

 2


 3        For Catalina Yachts, Inc.:

 4             ERVIN COHEN & JESSUP, LLP
               MICHAEL LIEB
 5             9401 WILSHIRE BOULEVARD, 12TH FLOOR
               Beverly Hills, California 90212
 6             mlieb@ecjlaw.com

 7
          For Sharon Day:
 8
               SHUMAKER, LOOP & KENDRICK, LLP
 9             STEVEN M. BERMAN
               MICHAEL BILIRAKIS
10             101 East Kennedy Boulevard, Suite 2800
               Tampa, Florida 33602
11             sberman@shumaker.com

12
          Also Present:
13
               SHARON DAY
14
               DAVID DAY
15
               HOLLY HANNAH
16
               JONATHON MASTERS
17
               RUSSELL BERNEY
18

19

20

21

22

23

24

25
```

Marc Reese
December 10, 2025

```
 1                  INDEX TO EXAMINATION

 2        WITNESS: MARC REESE

 3   EXAMINATION                                    PAGE

 4   By Mr. Berman                                    5

 5

 6             WITNESS INSTRUCTED NOT TO ANSWER

 7                    PAGE       LINE
                       54          2
 8                     54         15
                       69         15
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Marc Reese
December 10, 2025

1    it?

2        A    It was a rental property that had a building on

3    it that was rented out to different individual

4    companies.

5        Q    Okay.  And it was a marina?

6        A    I wouldn't technically call it that.  I don't

7    believe that they actually had slips that they rented,

8    but it was on the water.

9        Q    Okay.  And can you describe it physically?  How

10   many acres was it on the water?

11       A    I don't recall.  I don't know.

12       Q    Okay.  Do you know how much it was sold for?

13       A    Yes, 12.5 million.

14       Q    How much?

15            Okay.  Did you know that before it was sold to

16   the ultimate purchaser, it was transferred to a company

17   called Catalina Investments LLC for $10?

18       A    Did I know that?  No.

19       Q    Yes.  Okay.

20            You weren't the president in 2024, were you?

21       A    No.

22       Q    Do you know who was giving direction to the

23   president in 2024?

24            MR. LIEB:  Assumes facts not in evidence.

25            Go ahead.

Mary Reese
December 10, 2025

1              THE WITNESS:  In 2024 that would be Sharon Day

2     that was the president.

3     BY MR. BERMAN:

4         Q    Right.  And do you know who -- who from the

5     shareholders would have given her direction with respect

6     to a sale?

7         A    My assumption would be Jean Butler.

8         Q    Okay.  And do you know why the Salt Creek

9     property was sold?

10        A    Why it was sold?  No, I do not.

11        Q    Yes.

12        A    No.

13        Q    Okay.

14        A    I don't know why.

15        Q    And do you know who Catalina Investments LLC

16    is?

17        A    Yes.

18        Q    Who is it?

19        A    It's a wholly owned subsidiary of Catalina

20    Yachts, Inc.

21        Q    Okay.  And do you know why it received a

22    transfer of $12 1/2 million of property for $10?

23        A    I can't tell you the why.  I don't know why.

24        Q    Okay.  Do you know out of the $12 1/2 million

25    if 5 percent of the sales proceeds were set aside for