1  Shumaker, Loop & Kendrick, LLP
2  Steven M. Berman, Bar No. 256846
   sberman@shumaker.com
3  101 East Kennedy Boulevard
   Suite 2800
4  Tampa, Florida 33602
   Telephone:  813.229.7600
5  Facsimile:  813.229.1660

6  Attorneys for Defendant
   Sharon Day

7

8              **UNITED STATES DISTRICT COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11 CATALINA YACHTS, INC., a          Case No. 2:25-CV-04090-SVW-RAO
   California Corporation,
12                                    Assigned to The Hon. Stephen V.
              Plaintiff,              Wilson
13
        v.                            **REDACTED**
14
   SHARON DAY, an individual;         **SHARON DAY'S APPENDIX OF**
15 GERARD DOUGLAS, an individual;     **EVIDENCE IN SUPPORT OF**
   and DOES 1 through 10, inclusive,  **OPPOSITION TO CATALINA**
16                                    **YACHTS, INC.'S RENEWED**
              Defendants              **MOTION FOR SUMMARY**
17                                    **JUDGMENT**

18 GERARD DOUGLAS,
                                      *[Filed concurrently with Opposition to*
19            Plaintiff               *Motion; Opposition to Separate*
                                      *Statement; Declaration of Steven M.*
20      v.    _____        *Berman; and Evidentiary Objections]*

21
              Defendant               Date: March 16, 2026
22                                    Time: 1:30 p.m.
   and                                Courtroom 10A
23
                                      Action Filed: May 7, 2025
24 SHARON DAY,                        Trial Date: April 21, 2026

25 Counterclaim Plaintiff,

26      v.

27 CATALINA YACHTS, INC.,
   a California Corporation,

28

SHUMAKER, LOOP &
KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

38975341v1

- 1 -

APPENDIX OF EVIDENCE
2:25-CV-04090

Counterclaim Defendant.

Defendant/Counter-Plaintiff, Sharon Day, submits this Appendix of Evidence in support of her Opposition to Catalina Yachts, Inc.'s Renewed Motion for Summary Judgment (Doc. 122).

| Exhibit Number | Document Description | Exhibit Authenticated By |
|:---:|---|---|
| 1 | Deposition Transcript of Corporate Representative of Catalina Yachts, Inc., taken on December 10, 2025 | Steven M. Berman |
| 2 | Warranty Deed reflecting November 2020 sale to Generation Church of Tampa Bay, Inc. | Steven M. Berman |
| 3 | Warranty Deed reflecting July 2024 sale to Prometheus Maritime Properties | Steven M. Berman |
| 4 | Asset Purchase Agreement dated April 23, 2025 (to be filed under seal) | Steven M. Berman |
| 5 | Affidavit of Michael Reardon | Steven M. Berman |
| 6 | Deposition Transcript of Keith Lichtman, taken on December 8, 2025 | Steven M. Berman |

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

- 2 -

APPENDIX OF EVIDENCE
2:25-CV-04090

38975341v1

| 7 | Bonus Compensation Agreement dated November 18, 2002 | Steven M. Berman |
| 8 | Deposition Transcript of Patrick Turner, taken on November 21, 2025 | Steven M. Berman |
| 9 | Deposition Transcript of Nancy Bear, taken on December 10, 2025 | Steven M. Berman |
| 10 | Email sent by Steve Berman to, *inter alia*, Alex Leitch on April 29, 2025. | Steven M. Berman |

Dated: February 23, 2026
            SHUMAKER, LOOP & KENDRICK, LLP
            Steven M. Berman
            By: */s/ Steven M. Berman*
                Steven M. Berman
                Attorney for Defendant
                SHARON DAY

SHUMAKER, LOOP & KENDRICK, LLP
ATTORNEYS AT LAW
TAMPA

- 3 -

APPENDIX OF EVIDENCE
2:25-CV-04090

38975341v1

# EXHIBIT 1

Marc Reese
December 10, 2025

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION


CATALINA YACHTS, INC., a
California Corporation,

              Plaintiff,

      vs.                  CASE NO. 2:25-CV-04090-SVW-RAO

SHARON DAY, an individual;
GERARD DOUGLAS, an individual;
and DOES 1 through 10,
inclusive,

              Defendants.
_____

AND RELATED CROSS-ACTIONS.
_____




RULE 30(b)(6) DEPOSITION OF CATALINA YACHTS, INC.,

THROUGH MARC REESE

APPEARING REMOTELY

December 10, 2025

12:38 p.m.



REPORTED STENOGRAPHICALLY BY:

Deborah L. Heskett

CVR, CSR No. 11797

APPEARING FROM SAN BERNARDINO COUNTY, CALIFORNIA

Mason Reese
December 10, 2025

```
 1    REMOTE APPEARANCES:

 2

 3         For Catalina Yachts, Inc.:

 4              ERVIN COHEN & JESSUP, LLP
                MICHAEL LIEB
 5              9401 WILSHIRE BOULEVARD, 12TH FLOOR
                Beverly Hills, California 90212
 6              mlieb@ecjlaw.com

 7

        For Sharon Day:
 8
                SHUMAKER, LOOP & KENDRICK, LLP
 9              STEVEN M. BERMAN
                MICHAEL BILIRAKIS
10              101 East Kennedy Boulevard, Suite 2800
                Tampa, Florida 33602
11              sberman@shumaker.com

12

        Also Present:
13
                SHARON DAY
14
                DAVID DAY
15
                HOLLY HANNAH
16
                JONATHON MASTERS
17
                RUSSELL BERNEY
18

19

20

21

22

23

24

25
```

Marc Reese
December 10, 2025

```
1                    INDEX TO EXAMINATION

2          WITNESS: MARC REESE

3    EXAMINATION                                        PAGE

4    By Mr. Berman                                        5

5

6              WITNESS INSTRUCTED NOT TO ANSWER

7                      PAGE      LINE
                        54         2
8                       54        15
                        69        15
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Marc Reese
December 10, 2025

```
1      A     Not that I recall.

2      Q     Okay.  What's your cell phone number?

3      A     Area code (805) 890-0933.

4      Q     Can you describe for me the transition between

5  Patrick Turner and you in July of 2025 when he sort of

6  handed you the presidency?

7            MR. LIEB:  That mischaracterizes his testimony.

8            But go ahead and answer.

9            THE WITNESS:  Following the sale of the assets

10 of Catalina Yachts at which Mr. Turner was the president

11 of Catalina at that time, he transitioned over to the

12 new owner and he resigned his positions for Catalina

13 Yachts, Inc.

14 BY MR. BERMAN:

15     Q     Okay.  And what was the status of the company

16 at that time when you took over?  What were its assets,

17 its operations, that kind of thing?

18     A     What were its assets when I took over?

19     Q     Yes, in July of 2025.

20     A     We have a significant property holdings in

21 Florida.

22     Q     Okay.

23     A     Those -- there's a couple of DSTs that are also

24 owned by Catalina.

25     Q     When you say DST, do you mean a Delaware
```

Marc Reese
December 10, 2025

1      Q    Go ahead.  I wanted you to read it.

2      A    When bonus is earned.

3           Do you want me to read the rest of it?

4      Q    If you would.

5      A    Employee shall earn the bonus if employee

6   continues to work full-time for Catalina until the

7   earlier of Roman small i, the sale of Catalina, or small

8   ii, seven and one-half years from the date of execution

9   of this agreement.

10     Q    Okay.  So let me ask you this:  Was Catalina

11  sold?

12     A    Was Catalina sold?

13     Q    Yes.

14     A    The assets were sold.

15     Q    Okay.  And that was the Reardon sale?

16     A    Correct.

17     Q    What's the date of this agreement?

18     A    The date of this agreement?  2002.

19     Q    Yes.

20     A    2002.

21     Q    Okay.  And specifically November 18th; right?

22     A    Yeah.  It's pretty faded out.

23     Q    And do you know when Sharon Day retired?

24     A    It was the end of -- her resignation, I believe

25  it was the -- I'm not gonna -- I don't know to be exact,

Marco Reese
December 10, 2025

1    she worked at least seven and a half years from

2    November 18, 2002?

3          MR. LIEB:  It's been asked and answered.

4          THE WITNESS:  Absolutely she has.

5    BY MR. BERMAN:

6      Q    Okay.  And so with respect to this provision,

7    understanding there are other provisions as to timing,

8    but as to this provision, do you believe she's met the

9    "when bonus is earned" requirements in your reading?  I

10   understand you're not a lawyer.

11     A    For sure she's reached it because she worked

12   over the seven and a half years from that aspect.

13     Q    Okay.  Right.

14     A    Beyond that, I don't know what else you want me

15   to say.

16     Q    Okay.  You're hesitating because you're not

17   sure if Catalina was sold?

18     A    Well, the way this document is written up is a

19   little unclear in certain areas, and I believe this is

20   one of them.  And I think that it's confusing.

21     Q    Okay.  Fair enough.

22          What part of this agreement do you think is

23   unclear or confusing to you as the president of

24   Catalina?

25     A    As the president of Catalina?

Marc Reese
December 10, 2025

1  of the accounts payable that he assumed under the asset

2  purchase agreement?

3      A    I believe the amount that he was obligated to

4  cover was 1.4 to 5, if I'm not mistaken, towards the

5  account payable.

6      Q    So a million-dollar note plus an assumption of

7  $1,425,000 was the consideration he paid for the

8  Catalina assets?

9      A    Yes.

10     Q    Okay.  And how much did he pay by way of

11 deposit for the real estate?

12     A    For the lease?

13     Q    Yes.

14     A    I believe the total amount that he paid was

15 like $70,000.

16     Q    Okay.  Do you have any sense of the value of

17 the inventory and the work in process left at the

18 location?

19     A    At the time -- at the current time or when he

20 took it over?

21     Q    Yeah.  Well, current time, today.  If you

22 looked at inventory, you looked at finished goods, and

23 you looked at work in process, what would be your

24 assessment of the value?

25     A    Any assessment I would give would be a guess at

Marc Reese
December 10, 2025

1  and you've now testified that both those things have

2  happened; correct?

3          MR. LIEB:  Mischaracterizes testimony.

4          But go ahead.

5          THE WITNESS:  We sold the assets of Catalina.

6  BY MR. BERMAN:

7      Q    Right.

8      A    Not all of them.

9      Q    Okay.  But Sharon Day worked for seven and a

10  half years -- more than seven and a half years,

11  according to testimony, since November 18th of 2002,

12  right, before she retired?

13     A    Yes, that's correct.

14     Q    So even if you didn't sell Catalina as

15  described in 1.1, she certainly complied with

16  Romanette ii working seven and a half years from the

17  date of November 18th, 2002, before she retired; right?

18     A    I'm -- okay.  I'm not an attorney.  Okay?

19     Q    I understand.

20     A    And so consequently there's a lot of different

21  sections on this agreement, so I would think that there

22  might be sections that apply, and thus should all be

23  looked into it.

24     Q    Sure.

25     A    I think the -- to me, the main function was

Marc Reese
December 10, 2025

```
 1            MR. BERMAN:  Okay.

 2            MR. LIEB:  -- conclusion.

 3            MR. BERMAN:  I understand.

 4            THE WITNESS:  Can you ask your question again,

 5    please?

 6            MR. BERMAN:  Sure.

 7    BY MR. BERMAN:

 8       Q    I'm asking you to assume what Catalina's CPA

 9    told me, which is the Butlers will never sell their

10    shares of stock because there would be adverse tax

11    consequences to that.  And I'm asking you to equally

12    assume that Catalina will sell the church property, the

13    Salt Creek property, the business assets, and the other

14    Florida real estate that you believe is worth between 17

15    and $22 million and never sell its shares of stock.

16            So if the company just sells off its assets, at

17    that point in time, when would Sharon get her bonus?

18       A    That's part of the confusing part about the

19    document.

20       Q    Okay.  I appreciate that.

21            Have you had any discussions with any of the

22    family members about when you or the family members

23    think it's right to pay Sharon her deferred

24    compensation?

25       A    Have I?  No.
```

Marc Reese
December 10, 2025

1    time shortly after she resigned --

2        Q    Okay.

3        A    -- or retired.

4        Q    She really retired; right?

5        A    Correct.

6        Q    Okay.  And you use the phrase after you learned

7    there was a lawsuit about this bonus agreement.

8             What did you mean by that?

9        A    Well, I was made aware that there -- that there

10   was a lawsuit from Sharon to try and collect on the

11   bonus agreement.

12       Q    Okay.  Did you know that Catalina is who sued

13   Sharon to determine that there's no obligation under the

14   bonus agreement?  Catalina is who commenced lawsuit, not

15   Sharon.  Did you know that?

16       A    No.

17       Q    Did you know that Catalina initiated the

18   lawsuit?  And do you know who at Catalina would have

19   authorized the initiation of the lawsuit other than you?

20       A    That would be the trustee, Russell Berney.

21       Q    Okay.  So did Russell Berney act as an officer

22   of the corporation or just a shareholder?

23       A    He's trustee of vast majority of the company.

24   I can't tell you what he operates under, but that's the

25   reality of it.

Marc Reese
December 10, 2025

1          THE WITNESS:  In 2024 that would be Sharon Day

2    that was the president.

3    BY MR. BERMAN:

4       Q    Right.  And do you know who -- who from the

5    shareholders would have given her direction with respect

6    to a sale?

7       A    My assumption would be Jean Butler.

8       Q    Okay.  And do you know why the Salt Creek

9    property was sold?

10      A    Why it was sold?  No, I do not.

11      Q    Yes.

12      A    No.

13      Q    Okay.

14      A    I don't know why.

15      Q    And do you know who Catalina Investments LLC

16   is?

17      A    Yes.

18      Q    Who is it?

19      A    It's a wholly owned subsidiary of Catalina

20   Yachts, Inc.

21      Q    Okay.  And do you know why it received a

22   transfer of $12 1/2 million of property for $10?

23      A    I can't tell you the why.  I don't know why.

24      Q    Okay.  Do you know out of the $12 1/2 million

25   if 5 percent of the sales proceeds were set aside for

Marc Reese
December 10, 2025

1    Sharon Day and for Gerry Douglas pursuant to their bonus

2    compensation agreements?

3         A    I'm not aware of that.

4         Q    Okay.  If I told you I asked the same question

5    of Patrick Turner and Keith Leichtman and they told me

6    they were unaware of any reserves established to pay

7    Sharon Day or Gerry Douglas out of the proceeds from the

8    Salt Creek property, would that surprise you?

9         A    No.

10        Q    Let me show you another document.

11        A    Is it part of the same group?

12        Q    No.  I'm going to go to a different exhibit.

13   I'll give you something else.  Just hold on one sec.

14             MR. BERMAN:  Let's mark as Exhibit 5 Tab 9.

15             (Exhibit 5 identified)

16             THE WITNESS:  I have it.

17   BY MR. BERMAN:

18        Q    Do you know who Michael Reardon is?

19        A    Yes.

20        Q    And you became the president shortly after the

21   sale of the business to Mr. Reardon; correct?

22        A    Shortly after the assets were sold, Patrick

23   resigned and I replaced him.

24        Q    Okay.  Because he went to go work for Michael

25   Reardon at that point?

EXHIBIT 2

Prepared By and Return To:
Thomas F. Cox, Esquire
Cox & Sanchez
P.O. Box 40008
St. Petersburg, FL 33743
Ph: (727) 896-2691

Tax Parcel No. 18/30/16/28955/000/0400

---

### WARRANTY DEED

THIS INDENTURE, made this _19_ day of November, 2020, between Catalina Yachts, Inc. a California Corporation, Sharon Day, Vice President, whose address is 21200 Victory Blvd., Woodland Hills, CA 91367, hereinafter called Grantor, and Generation Church of Tampa Bay, Inc., a Florida Not for Profit Corporation, whose address is 10321 – 75th Street, Largo, Florida 33777, hereinafter called Grantee;

W I T N E S S E T H :

That said Grantor, for and in consideration of the sum of Ten Dollars, and other good and valuable considerations, to said Grantor in hand paid by said Grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said Grantee, and Grantee's heirs and assigns forever, the following described land, situate, lying and being in the County of Pinellas, State of Florida, to-wit:

Lot 40, FOREST INDUSTRIAL PARK, according to the map or plat thereof as recorded in Plat Book 85, Page 86, Public Records of Pinellas County, Florida.

SUBJECT TO EASEMENTS, RESTRICTIONS AND AGREEMENTS OF RECORD, IF ANY. SUBJECT TO TAXES FOR THE YEAR 2020 AND ALL SUBSEQUENT YEARS.

Tax Parcel No. 18/30/16/28955/000/0400

and said Grantor does hereby fully warrant the title to said land, and will defend the same against the lawful claims of all persons whomsoever.

"Grantor" and "Grantee" are used for singular or plural, as context requires.

CONFIDENTIAL

CAT000120

IN WITNESS WHEREOF, Grantor has hereunto set Grantor's hand and seal the day and year first above written.

Signed, sealed and delivered
in our presence:

Catalina Yachts, Inc.
a California Corporation

_Keith Lichtman_ (signature)

_Sharon Day_ (signature)

Signature
Printed Name: KEITH LICHTMAN

Sharon Day, Vice President

Signature
Printed Name: Daninza Monterroso

STATE OF _CA_

COUNTY OF _Los Angeles_     See Attached Acknowledgment

   The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization, this _____ day of November, 2020 Sharon Day, Vice President of Catalina Yachts, Inc., a California Corporation, on behalf of the corporation, who is personally known to me or who has produced _____ as identification.

[Notary Seal]          _____
                       Notary Public

                       _____
                       Name typed, printed or stamped
                       My Commission Expires: _____

CONFIDENTIAL

CAT000121

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                                 CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                     )

County of __Los Angeles__         )

On __November 19 2020__ before me, __**M. Santana, Notary Public**__
       *Date*                  *Here Insert Name and Title of the Officer*

personally appeared __SHARON DAY__

                             *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

```
M. SANTANA
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 2291015
LOS ANGELES COUNTY
My Comm. Exp. June 9, 2023
```

Signature _____

                 *Signature of Notary Public*

       *Place Notary Seal Above*

———————————————— OPTIONAL ————————————————

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: __WARRANTY DEED__
Document Date: __November 19 2020__ _____ Number of Pages: __2__
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer — Title(s): ____ | ☐ Corporate Officer — Title(s): ____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

# EXHIBIT 3

Prepared By and Return To:
Thomas F. Cox, Esquire
Cox & Sanchez
P.O. Box 21351
St. Petersburg, FL 33742
Ph: (727) 896-2691

Tax Parcel No. 30/31/17/78600/001/0010

Consideration: $10.00
_____ /

## WARRANTY DEED

THIS INDENTURE, made this 23rd day of July, 2024, between Catalina Yachts, Inc. a California Corporation, whose address is 7200 Bryan Dairy Road, Seminole, Florida 33777, hereinafter called Grantor, and Catalina Investments, LLC, a Florida Limited Liability Company, whose address is 3807 Weatherly Circle, Westlake Village, CA 91361, hereinafter called Grantee;

### WITNESSETH:

That said Grantor, for and in consideration of the sum of Ten Dollars, and other good and valuable considerations, to said Grantor in hand paid by said Grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said Grantee, and Grantee's heirs and assigns forever, the following described land, situate, lying and being in the County of Pinellas, State of Florida, to-wit:

SEE LEGAL DESCRIPTION ATTACHED AS EXHIBIT A

SUBJECT TO EASEMENTS, RESTRICTIONS AND AGREEMENTS OF RECORD, IF ANY. SUBJECT TO TAXES FOR THE YEAR 2024 AND ALL SUBSEQUENT YEARS.

Tax Parcel No. 30/31/17/78600/001/0010

**THIS IS THE NON-HOMESTEAD PROPERTY OF GRANTOR.**

**This transfer is not subject to documentary stamp tax as the Grantor (parent company) is transferring the subject property to Grantee (wholly owned subsidiary). There is no exchange of value. See *Crescent Miami Center, LLC vs. the Florida Department of Revenue, 903 So. 2d 913 (Fla. 2005).***

and said Grantor does hereby fully warrant the title to said land, and will defend the same against the lawful claims of all persons whomsoever.

"Grantor" and "Grantee" are used for singular or plural, as context requires.

IN WITNESS WHEREOF, Grantor has hereunto set Grantor's hand and seal the day and year first above written.

Signed, sealed and delivered
in our presence:

Catalina Yachts, Inc.
a California Corporation

_____
Signature
Printed Name: _Thomas F Cox_

_9800 4th Strat N, #200_
_St. Petersburg, FL 33702_

_____
Sharon Day, President

_____
Signature
Printed Name: _PATRICK TURNER_

_7200 Bryan Dairy Rd._
_Largo, FL 33777_

STATE OF FLORIDA

COUNTY OF PINELLAS

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization, this __23__ day of July, 2024 Sharon Day, President of Catalina Yachts, Inc., a California Corporation, on behalf of the corporation,  who is personally known to me or who has produced _____ as identification.

[Notary Seal]

_____
Notary Public

_Thomas F. Cox_
Name typed, printed or stamped
My Commission Expires: _____



THOMAS F. COX
Commission # HH 268413
Expires September 23, 20??

## EXHIBIT "A"
Legal Description of the Property

Fee Parcel 1
Lot 1, Block 1, SALT CREEK BAYBORO SUBDIVISION # 2, according to the plat thereof as recorded in Plat Book 134, Page 62 and 63, of the public records of Pinellas County, Florida.

Easement Parcel 2
Easements as contained in that certain Quit Claim Deed, by and between Joseph K. Silvernail, as Grantor, and Vincent S. Lazzara, Steven B. Lazzara, Richard C. Lazzara and Joseph M. Fontana, as Grantees, filed December 28, 1995, recorded in Book 9205, Page 586 of Official Records, of Public Records of Pinellas County, Florida.

Easement Parcel 3
Easements as contained in that certain Cross Easement Agreement, by and between Catalina Yachts, Inc., a California corporation, as Grantor, and Joseph K. Silvernail, as Grantee, filed December 1, 2004, recorded in Book 13971, Page 1180 of Official Records, of the Public Records of Pinellas County, Florida.

Case 2:25-cv-01009-SCM-RAC Document 126-3 Filed 08/26/25 Page 25 of 72 Page
ID #:2825

This Instrument Prepared by and return to:

R. Andrew George, Esq.

520 D Street, Suite C

Clearwater, FL 33756

Tax Parcel ID: 30-31-17-78600-001-0010

## WARRANTY DEED

THIS WARRANTY DEED is made as of July 25, 2024, between **CATALINA INVESTMENTS, LLC**, a Florida limited liability company, whose mailing address is 3807 Westherly Circle, Westlake Village, California 91361 (the "Grantor"), and **PROMETHEUS MARITIME PROPERTIES, LLC**, a Delaware limited liability company, whose mailing address is 520 D Street, Suite C, Clearwater, Florida 33756 (the "Grantee").

Whenever used herein and wherever the context permits or requires, the terms "Grantor" and "Grantee" shall include the singular and the plural; the heirs, legal representatives, and assigns of individuals; and the successors and assigns of corporations, companies, trusts, and partnerships.

## W I T N E S S E T H :

That Grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations to Grantor in hand paid by Grantee, the receipt and sufficiency of which are hereby acknowledged, has granted, bargained and sold to Grantee and Grantee's successors and assigns forever, that certain parcel of land lying and being in Pinellas County, State of Florida (the "Property"), more particularly described as follows:

See **Exhibit "A"** attached hereto and incorporated herein.

TOGETHER WITH all and singular, the tenements, hereditaments, and appurtenances thereto belonging or in anywise appertaining, and every right, title, or interest, legal or equitable, of Grantor in and to the same.

TO HAVE AND TO HOLD the same in fee simple forever.

AND the Grantor hereby covenants with said Grantee that the Grantor is lawfully seized of said land in fee simple; that the Grantor has good right and lawful authority to sell and convey said land; and that the Property is free of all encumbrances except taxes and assessments accruing subsequent to December 31, 2023. The Grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever.

IN WITNESS WHEREOF, Grantor has caused this Warranty Deed to be duly executed
and delivered in its name on the date set forth above.

Signed, sealed, and delivered
in the presence of:

**GRANTOR:**

**CATALINA INVESTMENTS, LLC.**
a Florida limited liability company

Print Name: Marc Reese

By: Jean Butler

Address: 3802 Weatherly Cir
Westlake Village CA
91361

Name: Jean Butler
Title: Manager

Print Name: Michael Murphy

Address: 2625, Townsgate Rd, Westlake Village, CA 91361
7/20/24

STATE OF California
COUNTY OF Los Angeles

The foregoing instrument was acknowledged before me by means of ☒ physical presence
or ☐ online notarization, this 22 day of July, 2024, by Jean Butler, as Manager of CATALINA
INVESTMENTS, LLC, a Florida limited liability company, on behalf of the company, who is ☐
personally known to me or ☒ produced CADL YO415174           as identification.

Sean Chavel

Signature

Print Name: Sean Chavel
Notary Public, State and County aforesaid
Commission No.: 2408719
My Commission Expires: 6-21-26

see attachment

# CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                    }

COUNTY OF Los Angeles }

On 7-22-24 before me, _____ Sean Chavel _____ Notary Public,

personally appeared _____ Jean Butler _____

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SEAN CHAVEL
Notary Public - California
Los Angeles County
Commission # 2408719
My Comm. Expires Jun 21, 2026

Signature: Sean Chavel (Seal)

_____ OPTIONAL _____

Description of Attached Document

Title or Type of Document: Warranty Deed    Number of Pages: 4

Document Date: 7-22-24    Other: _____

**EXHIBIT "A"**
Legal Description of the Property

Fee Parcel 1
Lot 1, Block 1, SALT CREEK BAYBORO SUBDIVISION # 2, according to the plat thereof as recorded in Plat Book 134, Page 62 and 63, of the public records of Pinellas County, Florida.

Easement Parcel 2
Easements as contained in that certain Quit Claim Deed, by and between Joseph K. Silvernail, as Grantor, and Vincent S. Lazzara, Steven B. Lazzara, Richard C. Lazzara and Joseph M. Fontana, as Grantees, filed December 28, 1995, recorded in Book 9205, Page 586 of Official Records, of Public Records of Pinellas County, Florida.

Easement Parcel 3
Easements as contained in that certain Cross Easement Agreement, by and between Catalina Yachts, Inc., a California corporation, as Grantor, and Joseph K. Silvernail, as Grantee, filed December 1, 2004, recorded in Book 13971, Page 1180 of Official Records, of the Public Records of Pinellas County, Florida.

# EXHIBIT 4

**WILL BE FILED UNDER SEAL**

EXHIBIT 5

1  Shumaker, Loop & Kendrick, LLP
   Steven M. Berman, Bar No. 305704
2  sberman@shumaker.com
   101 East Kennedy Boulevard
3  Suite 2800
   Tampa, Florida 33602
4  Telephone: 813.229.7600
   Facsimile: 813.229.1660
5
   Attorney for Defendant
6  Sharon Day

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                  LOS ANGELES DIVISION

11

12  CATALINA YACHTS, INC., a        Case No. 2:25-CV-04090-SVW-RAO
    California Corporation,
13                                  **DECLARATION OF MICHAEL**
                Plaintiff,          **REARDON**
14
         v.                         Judge:    Hon. Stephen V. Wilson
15
    SHARON DAY, an individual;      Action Filed: May 7, 2025
16  GERARD DOUGLAS, an individual;  Trial Date:   January 6, 2026
    and DOES 1 through 10, inclusive,
17
                Defendants.
18

19  ──────────────────────────────
    AND RELATED COUNTERCLAIMS
20

21

22       NOW COMES Declarant Michael Reardon and declares under penalty of

23  perjury as follows:

24       1.    I make this declaration based on my personal knowledge and, if called

25  as a witness, I could and would testify competently to the facts stated herein.

26       2.    I first learned that Catalina Yachts, Inc. ("Catalina") was potentially for

27  sale at the Miami Boat Show around February 14, 2025, when I first met Patrick

28  Turner, who was then the President of Catalina.

SHUMAKER, LOOP &
KENDRICK, LLP

                              - 1 -         DECLARATION OF MICHAEL REARDON

3.    In early March 2025, I entered into negotiations with Marc Reese and Russell Berney to purchase the assets of Catalina.

4.    At all times, Mr. Reese and Mr. Berney acted on behalf of the ownership of and for Catalina.

5.    The negotiations culminated in an agreement to purchase the assets of Catalina, as memorialized in the signed, confidential Asset Purchase Agreement dated April 23, 2025.

6.    Toward the end of April 2025, and prior to execution of the Asset Purchase Agreement, I received a call from the Shumaker law firm to schedule a call with Sharon Day's attorney, Steve Berman.  I learned during that call that Ms. Day had an employment agreement that promises a payment upon the sale of Catalina. Given that I was negotiating to purchase Catalina and this obligation was not disclosed to me, I was surprised to learn of it from Ms. Day's counsel.

7.    I did not agree to take on this liability, so the Asset Purchase Agreement, which was still being negotiated, was revised at that time to exclude any liability, related to Ms. Day's employment contract, somehow being transferred to me.

8.    Mr. Berney and Mr. Reese informed me during negotiations that Catalina was aware of the obligation to pay Ms. Day following consummation of our revised Asset Purchase Agreement.  Mr. Berney and Mr. Reese told me clearly Catalina was aware of and would pay the obligation to Ms. Day and that I would not be responsible for it.

9.    No other similar liability was disclosed during my negotiations to purchase the assets of Catalina.

10.    If called to testify at any trial in the case, involving Catalina and Ms. Day regarding Catalina's obligation to pay Ms. Day following the sale of Catalina's assets to me, I will testify consistent with this declaration herein.

1    I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3

4   Executed on ~~Sept 22 2025~~, at Edenton, North Carolina.

5

6

7   Michael Reardon

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 6



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION


CATALINA YACHTS, INC.,

       Plaintiff,

v.              Case No. 2:25-CV-04090-SVW-RAO

SHARON DAY, an individual; et al.,

       Defendants._____

GERARD DOUGLAS,

       Counter-Plaintiff.,

v.

CATALINA YACHTS, INC., et al.,

       Counter-Plaintiff._____

SHARON DAY,

       Counter-Plaintiff,

v.

CATALINA YACHTS, INC., et al.,

       Counter-Defendants._____

DEPOSITION OF

KEITH LICHTMAN

TAKEN ON

MONDAY, DECEMBER 8, 2025

10:36 A.M.

SIMI VALLEY, CALIFORNIA 93065



1                           APPEARANCES

2

3   Appearing on behalf of Plaintiff Catalina Yachts,

4   Inc. and Counter-Defendants Russell Lane Berney and

5   Jean C. Butler:

6   ZOE M. VALLIER, ESQUIRE

7   Ervin Cohen and Jessup LLP

8   9401 Wilshire Boulevard, 12th Floor

9   Beverly Hills, California 90212

10  (310) 273-6333

11  zvallier@ecjlaw.com

12

13  Appearing on behalf of Defendant and Counter-

14  Plaintiff Sharon Day:

15  STEVEN M. BERMAN, ESQUIRE (via Zoom)

16  MICHAEL C. BILIRAKIS, ESQUIRE (via Zoom)

17  Shumaker Loop and Kendrick LLP

18  101 East Kennedy Boulevard, Suite 2800

19  Tampa, Florida 33602

20  (813) 229-7600

21  sberman@shumaker.com

22  mbilirakis@shumaker.com

23

24

25

```
 1                  APPEARANCES (CONTINUED)

 2

 3   Also Present:

 4   Russell Berney, Counter-Defendant

 5   Marc Reece, Counter-Defendant, (via Zoom)

 6   Jonathan Masters, Paralegal, Shumaker Loop and

 7   Kendrick LLP, (via Zoom)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  paid the rent.  They were interested in the rent,

2  when's he going to pay the rent, when's he going to

3  pay the rent, those of questions, but being that I

4  worked for the new company, I couldn't -- I told

5  them to -- referred them to Michael Reardon because

6  I didn't have that knowledge on when he was going to

7  pay or not pay.

8       **Q.   When the sale of the Catalina Yachts'**

9  **assets to Mr. Reardon's new company occurred, was**

10 **any money set aside to pay the retirement**

11 **obligations owed to Sharon Day?**

12      A.   No.

13      **Q.   You talked about the church property, who**

14 **was the buyer of the church property; if you recall?**

15      A.   Generation Church was the buyer.  They may

16 have had some names associated with that, but that's

17 who bought it.

18      **Q.   And do you remember how much they paid for**

19 **that parcel?**

20      A.   I'm going to say a million and a half -- a

21 million and 500,000.

22      **Q.   Okay.  And do you remember about when that**

23 **occurred?**

24      A.   I do not, but it was -- it was -- it was

25 negotiated while Frank Butler was alive, either

KEITH LICHTMAN                    December 08, 2025                              30
91973

 1 | not sure of the property size anymore.
 2 |     Q.   And you described it in your earlier
 3 | testimony as Catalina selling the Salt Creek
 4 | property to itself.  What did you mean by that?
 5 |     A.   They -- through -- through, you know,
 6 | Catalina Yachts sold it to Catalina Investments, and
 7 | I believe Catalina Investments sold it to
 8 | Prometheus, which is the eventual buyer.  But I'm
 9 | not -- I'm, you know, I'm not sure of the exact
10 | timeline or how that -- and then -- and then
11 | Catalina Investments then owed Catalina, Inc. that
12 | amount of money, so --
13 |     Q.   Okay.  And do you remember approximately
14 | what the sales price was to that third party?
15 |     A.   Yeah, I think it -- I think it was
16 | approximately --
17 |          THE REPORTER:  Sorry.  Just let each other
18 | totally finish questions and answers before
19 | starting, just so we can get a clean record.
20 |     A.   I think it was around twelve million five
21 | hundred thousand.
22 |     Q.   Okay.
23 |     A.   Before escrow freezing -- before escrow
24 | freezing it.
25 |     Q.   Right.  And so the twelve million five

1  hundred thousand from the Salt Creek property and

2  the million and a half from the church property gets

3  us to about $14 million.  Were any of those $14

4  million of asset sales set aside to pay Sharon Day

5  her retirement monies?

6      A.   No, not that I know of, no.

7      Q.   Do you know who took the $14 million from

8  the various asset sales of the Salt Creek property

9  and the church property?

10     A.   The church property, Catalina Yachts, Inc.

11 used to continue operations.  That was used to

12 continue operations.

13     Q.   Okay.

14     A.   And then --

15     Q.   After it was sold to the church?

16     A.   Yeah.  Yeah.  It was in our bucket to use.

17          MARC REESE:  Mr. Berman?

18          MR. BERMAN:  I'm sorry.  Is there a

19 question from a third party?

20 BY MR. BERMAN:

21     Q.   I'm sorry, Mr. Lichtman, you can continue.

22     A.   Yeah, so we used that money to have -- to

23 continue because when you have 20 boats on the

24 floor, 15 boats on the floor, it takes a lot of

25 money for the work in process, so we were using that

KEITH LICHTMAN                    December 08, 2025                        32
91973

1  money to cover our work in process, we were using

2  that money to cover any losses we had, year in and

3  year out.  The twelve and a half million was --

4  Catalina Yachts Florida never -- never got to

5  receive any of that money or use it in production.

6       **Q.   And so you indicated that some of the**

7  **church money was used for operations, but the Salt**

8  **Creek sale proceeds were not used for the**

9  **operations?**

10      A.   Correct.

11      **Q.   And at any point in time after the Salt**

12 **Creek property was sold -- first of all, do you**

13 **recall when the Salt Creek property was sold**

14 **approximately?**

15      A.   Latter part of 2024, I think.  The last

16 quarter, September of 2024, I think.

17      **Q.   Okay.  And was Catalina Yachts able to pay**

18 **all of its financial obligations in the ordinary**

19 **course at the point in time when it sold the Salt**

20 **Creek property?**

21      A.   No.  We were having financial difficulty.

22 Our boat sales were down.  We had too many boats on

23 the floor that dealers may have stopped ordering, or

24 they held on, saying, you know, "We need more time,"

25 numerous reasons.  But, no, we were not financially

 1  functioning like we had during the COVID years.

 2      Q.    Okay.   During the time period when Sharon

 3  Day was the president?

 4      A.    Right.   Yeah.

 5      Q.    Were things better when she was the

 6  president?

 7      A.    Well, I think things were because we had

 8  more boats on order, we had more control of the

 9  funding to place where and when and how we could

10  beef up our shortfalls.

11      Q.    And when you had shortfalls in meeting

12  customer obligations, did you ask any of the Butler

13  family members or anyone else if you could use any

14  of the $14 million of asset sales to help --

15      A.    Yes.   I'm sorry.   I didn't let you finish.

16            But, yes, we -- we asked at the time.

17      Q.    Who did you ask?

18      A.    Well, I think -- I think Marc Reece, he

19  was our go-to person, and he would follow up and ask

20  Mr. Russell.   I'm not sure if Jean had very much

21  decision making at that time, or Nancy, a

22  combination of Nancy and Marc.   Yeah, a lot of

23  emails, Berney and Mr. Russell was included.

24      Q.    And whether it was Marc Reece or Nancy --

25  is her last name Bear?

1       A.    Yes.

2       Q.    So Marc Reece, Nancy Bear, or Russell

3  Berney, you would ask them if you could use some of

4  the $14 million of asset sales for operations.  Were

5  they officers in the company?

6       A.    I'm not sure if they were officers, but

7  the 14 million we had already -- the one and a half

8  million we had already used up.

9       Q.    Okay.

10      A.    And so --

11      Q.    For operations?

12      A.    Yeah.  Yeah.

13      Q.    So it was just the twelve and a half

14  million from the Salt Creek property that you

15  could've used for operations?

16      A.    Correct.  Right.  Yeah.

17      Q.    Okay.  And you don't know if Mr. Reece, or

18  Mr. Berney, or Ms. Bear were officers, but they were

19  certainly representatives of the shareholders;

20  right?

21      A.    Right.  Sharon Day would not do anything

22  at that time without -- without permission because

23  they had told her to restrict how she was running

24  the company, is my understanding.  So we had to go

25  ask permission when we needed some funds that we

 1  couldn't get from selling the boats.

 2      Q.   And do you know who's holding that twelve

 3  and a half million dollars from the Salt Creek

 4  property?  Who at Catalina Investments is holding

 5  that money up presently?

 6      A.   I mean, those three people would be in

 7  charge of that, but that money got -- it was in a

 8  tax exchange, a 1030 tax exchange, that they went

 9  out and bought other property to alleviate the tax

10  burden, is my understanding.

11      Q.   Oh, so Catalina Investments took the cash

12  that belonged to Catalina Yachts and bought more

13  property with it in a 1031 exchange?

14      A.   Yes.  Yes, 1031 exchange.

15      Q.   Do you know what that other property is?

16      A.   No, I think it was some apartment

17  buildings that they were a part of.  I think it was

18  several companies are in that exchange, but that's

19  just what I understand.

20      Q.   Right.  But there were no purchases that

21  helped Catalina Yachts in its operations were there?

22      A.   No.

23           MR. BERMAN:  Give me just one moment to

24  look at some notes.

25           Let's go off the record for five minutes,

# EXHIBIT 7

# SHARON DAY
## Bonus Compensation Agreement

This Agreement is entered into and effective on ⟨handwritten⟩  ⟨handwritten⟩ , 2002, by and between:

- (i) **Sharon Day** ("Employee");
- (ii) **Frank Butler** and **Jean Butler**, as individuals; and
- (iii) **Catalina Yachts**, a California Corporation, ("Catalina") with its principal place of business located in Woodland Hills, California.

### RECITALS

A.  Employee is a key employee of Catalina and a Director of Catalina Yachts, and has been employed by it for more than 25 years.

B.  Catalina wishes to retain Employee's services.

C.  All Catalina's issued and outstanding shares of stock are owned by the:

- (i) Butler Family Trust;
- (ii) Frank Butler Grantor Retained Annuity Trust - Catalina (Deborah);
- (iii) Frank Butler Grantor Retained Annuity Trust - Catalina (Mary);
- (iv) Frank Butler Grantor Retained Annuity Trust - Catalina (Nancy);
- (v) Frank Butler Grantor Retained Annuity Trust - Catalina (David);
- (vi) Jean Butler Grantor Retained Annuity Trust - Catalina (Deborah);
- (vii) Jean Butler Grantor Retained Annuity Trust - Catalina (Mary);
- (viii) Jean Butler Grantor Retained Annuity Trust - Catalina (Nancy); and
- (ix) Jean Butler Grantor Retained Annuity Trust - Catalina (David).

Reference in this Agreement to "**Butlers**" are intended to be to these trusts as a group.

## I.   Continued Employment and Bonus

### 1.1.   When Bonus Is Earned.

Employee shall earn the Bonus if Employee continues to work full-time for Catalina until the **earlier** of:

- (i) the sale of Catalina; or
- (ii) seven and one-half (7-1/2) years from the date of execution of this Agreement.

"Sale of Catalina" includes sale of the Butlers' stock **or** sale of all of Catalina's assets.

### 1.2. How Bonus Is Measured.

The Bonus shall be additional compensation equal to five percent (5%) of the:

(i)     net sales price; or

(ii)    value of Catalina, whichever is appropriate.

### 1.3. Determining Fair Market Value.

This paragraph applies if Catalina must be valued for purposes of determining the Bonus. Catalina shall select an independent, professional appraiser. The appraiser shall determine Catalina's fair market value. The Bonus shall be five percent (5%) of Catalina's fair market value, unreduced by discounts such as lack of marketability and lack of control. The appraisal shall be conclusive between the parties regarding the value of Catalina shares.

### 1.4. Minimum Bonus.

This minimum applies if all conditions of this Agreement are satisfied and despite the formula set forth above. The Bonus paid to Employee shall be no less than one million ($1,000,000).

### 1.5. Timing Of Payments.

Catalina agrees to pay the Bonus to Employee within sixty (60) days of payment to the Butlers of the consideration they are to be paid for their shares. If the consideration, or part of it, paid to the Butlers is in the form of the buyer's securities, Catalina or its acquirer shall convey to Employee five percent (5%) of the securities to be delivered to the Butlers.

### 1.6. Pro Ration Of Payments.

This paragraph applies if the monetary portion of the compensation to be paid for the Butlers' Catalina shares is not paid in a lump sum. Catalina shall pay to Employee five percent (5%) of the periodic payment(s) that are to be paid to the Butlers, or their successors in interest, for their shares as they are paid. Despite the length of time over which the Butlers receive periodic payments, all cash payments to be paid to Employee shall be fully paid no later than five (5) years after the beginning of periodic payments.

### 1.7. Binding On Parties.

The parties agree that the sales price and terms for all shares of Catalina stock negotiated by the Butlers, their heirs, or successors in interest shall be conclusive between the parties as to the value of Catalina Stock.

## II.     Termination of Employment

This paragraph applies if Employee dies or becomes totally disabled before the conclusion of seven and one-half (7-1/2) years from the date of this Agreement or sale of all of the outstanding Catalina shares, whichever comes first. Catalina shall pay Employee or Employee's estate, as the case may be, an amount equal to the value of five percent (5%) of the total number of outstanding Catalina shares. The payment shall be made within sixty (60) days of the date of Employee's death or total disability.

If Employee becomes unable to work full-time for Catalina due to illness or disability

Bonus Compensation Agreement re: Sharon Day
Page 3 of 4

not amounting to total disability, the parties agree to negotiate a modified arrangement which would allow Employee to continue a manageable work schedule and still receive a full bonus payment.

III.    **No Personal Liability**

The Butlers agree to notify any buyer of their stock of this Agreement.  The Butlers further agree to reconfirm, in the contract for the sale of their stock, Catalina's liability to make the payments provided for in this Agreement following the sale.  If Catalina is to be merged into another corporation after acquisition, the Butlers agree to obtain the surviving corporation's written consent to make the required payment(s).  If the Butlers take the steps outlined in this paragraph, they shall not have any personal liability to Employee.

IV.    **Entire Agreement**

This document constitutes the parties' entire understanding on this subject. Understandings or representations of any kind of preceding the date of this Agreement shall not bind any party except to the extent incorporated in this Agreement.  This Agreement may only be modified by a document in writing signed by all parties.

WHEREFORE, the parties have executed this Agreement on _November 18_ _____, 2002.


_____
**Sharon Day**


_____
**Jean Butler, Individually**


**Catalina Yachts,**
**A California Corporation**


_____
**By: Frank Butler, President**


_____
**Frank Butler, Individually**

Exhibit 1, Page 8

Bonus Compensation Agreement re: Sharon Day
Page 4 of 4

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

On November 18, 2002 before me, Michele Rene Borowski, a
Notary Public personally appeared **Sharon Day** personally know to me to be the person
whose name is subscribed to the within instrument and acknowledged to me that she
executed the same.

WITNESS my hand and official seal.

Signature



MICHELE RENE BOROWSKI
Commission # 1261216
Notary Public - California
Los Angeles County
My Comm. Expires Apr 20, 2004

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

On November 18, 2002 before me, Michele Rene Borowski, a
Notary Public personally appeared **Frank Butler** and **Jean Butler** personally known to me to
be the persons whose names are subscribed to the within instrument and acknowledged to
me that they executed the same as individuals, and that Frank Butler also executed this
instrument in his authorized capacity, and that by his signature on the instrument the entity
upon behalf of which he acted executed the instrument.

WITNESS my hand and official seal.

Signature

MICHELE RENE BOROWSKI
Commission # 1261216
Notary Public - California
Los Angeles County
My Comm. Expires Apr 20, 2004

# EXHIBIT 8

```
                                                    Page 1
 1                UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
 2                    LOS ANGELES DIVISION
                 Case No. 2:25-CV-04090-SVW-RAO
 3
      CATALINA YACHTS, INC., a
 4    California Corporation,
 5            Plaintiff,
      v.
 6    SHARON DAY, an individual;
      GERARD DOUGLAS, an individual;
 7    and DOES 1 through 10, inclusive,
 8            Defendants,
      _____/
 9    GERARD DOUGLAS,
10        Counter-Plaintiff
11    v.
12    CATALINA YACHTS, INC., a
      California corporation; RUSSELL LANE
13    BERNEY, as Trustee; JEAN C.
      BUTLER, as Trustee, MICHAEL
14    REARDON, an individual; and ROES 1
      through 5, as Trustees, inclusive,
15
      Counter-Defendant
16
      -- and --
17
      SHARON DAY,
18
          Counter-Plaintiff,
19    v.
20    CATALINA YACHTS, INC., a
      California corporation; MICHAEL
21    REARDON, an individual;,
22        Counter-Defendants.
      _____/
23
24
25
```

Page 2

```
1    DEPOSITION OF:        PATRICK TURNER
2    TAKEN BY:             Counsel for Defendants
3    DATE:                 November 21, 2025
4    TIME:                 11:17 a.m. to 2:32 p.m.
5    PLACE:                Shumaker Loop & Kendrick, LLP
                           101 East Kennedy Boulevard
6                          Suite 2800
                           Tampa, Florida 33602
7
     REPORTED BY:          Felicia A. Newland, CSR
8                          Notary Public
                           State of Florida at Large
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              A P P E A R A N C E S
 2      On behalf of Sharon Day:
 3          STEVEN M. BERMAN, ESQUIRE (Via Zoom)
 4          MICHAEL BILIRAKIS, ESQUIRE
 5          Shumaker Loop & Kendrick, LLP
 6          101 East Kennedy Boulevard
 7          Suite 2800
 8          Tampa, Florida 33602
 9          sberman@shumaker.com
10      On behalf of Catalina Yachts, Inc.:
11          ZOE M. VALLIER, ESQUIRE (Via Zoom)
12          Ervin Cohen & Jessup
13          9401 Wilshire Boulevard
14          12th Floor
15          Beverly Hills, California 90212
16          zvallier@ecjlaw.com
17      On behalf of Gerard Douglas:
18          BONNIE MCKNIGHT, ESQUIRE (Via Zoom)
19          Panakos Law APC
20          555 West Beech Street
21          Suite 500
22          San Diego, California 92101
23          bmcknight@panakoslaw.com
24          -- and --
25
```

```
                                                    Page 4

 1              A P P E A R A N C E S (Cont'd)

 2         DANIEL KAPLAN, ESQUIRE (Via Zoom)

 3              The Law Offices of Daniel A. Kaplan

 4         555 W Beech Street

 5         Suite 500

 6         San Diego, California 92101

 7         dkaplan@danielkaplanlaw.com

 8      Also Present:

 9         Russell Berney (Via Zoom)

10         Marc Reese (Via Zoom)

11         John Masters, Shumaker Loop

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 18

```
 1          A    I believe it's still in the account.
 2          Q    Okay.  And where would that account be?
 3          A    I -- I do not recollect.  I don't
 4     remember where it is.  I don't remember the name of
 5     the company or whatever.
 6          Q    Okay.  Was it with a bank or with some
 7     other institution?
 8          A    I think it was some investment.  It was
 9     put in -- I forget what they call it.  It was put
10     into a fund that they -- it was part of a -- where
11     they go buy buildings or something like that.  I
12     don't know.  They get interest from that.  I don't
13     know what the name of it is.  I don't recall the
14     name, I guess.
15          Q    Okay.  And how much interest were you
16     able to pull out of that 12 million-dollar amount?
17          A    I think it was 65,000 a month.
18          Q    And was that cash flow sufficient to
19     address the operational shortfalls?
20          A    Yes, it helped, but not 100 percent.
21          Q    Did there come a point in time when the
22     company decided to sell its assets?
23          A    It was February of '24, and it decided to
24     start shutting down the company, the operations.
25          Q    And who made that decision?
```

Page 19

```
 1          A      Russell Berney.

 2          Q      And who is Russell Berney?

 3          A      He's the trustee of the estate, I guess.

 4          Q      Okay.  And did you report to him as the

 5     president of Catalina Yachts, Inc.?

 6          A      No.  He was just -- I reported to him as

 7     trustee.  He was the trustee, I was the president.

 8          Q      And was he a shareholder?

 9          A      I don't think he's a shareholder, he was

10     the trustee.  He was the controlling trustee of the

11     family trust.

12          Q      Why would you report to him if you were

13     the president and he wasn't the shareholder?

14                 Who told you to do that?

15          A      I guess I assumed it.

16          Q      Why?

17          A      Because they were telling me what to do,

18     what I needed to do.

19          Q      Russell Berney told you what to do?

20          A      Yes.

21          Q      And were there any other individuals who

22     also told you what to do as the president of the

23     company?

24          A      It was -- I was listening to some of the

25     family members that came down and looked at the
```

Page 38

```
 1        A     Yes.
 2        Q     And you were asking Mr. Reese?
 3        A     Yes.
 4        Q     And why were you asking Mr. Reese at that
 5   time when you were the president of Catalina Yachts,
 6   LLC --
 7        A     He was --
 8        Q     -- how -- let me just finish.
 9              Why were you asking Mr. Reese when you
10   were the president of Catalina Yachts how you could
11   use the money that Catalina Yachts held?
12        A     He was representative of the family
13   trust.
14        Q     Okay.
15        A     Or representative of the family.
16        Q     And of the shareholders?
17        A     He was representative of the family
18   basically.  He was the speaker, I guess.
19        Q     Okay.  And the family were the
20   shareholders, right, of the company?
21        A     As far as I know.  I do not know
22   100 percent that.
23        Q     Okay.  Do you know why monies from the
24   sale of assets would have gone into the control of
25   the shareholders before the debts and other
```

Page 39

```
 1      financial obligations of the company were paid?
 2           A      I do not know why.
 3           Q      And you needed the money for operations,
 4      right?
 5           A      We needed it for -- to prove the property
 6      and to continue the operations, yes.
 7           Q      And to pay the credit card bills that
 8      Ms. Day was personally obligated on, right?
 9           A      Correct.
10           Q      But instead of using the money to pay the
11      company's obligations and improve the assets, the
12      monies went to the control of the shareholders?
13           A      Yes.
14           Q      And so what did Mr. Reese tell you about
15      that money?
16           A      Just what he said in the e-mail.
17           Q      And so what arrangement emerged from your
18      communications in July of 2024?
19           A      That I would have ability to get the
20      interest from the investment.
21           Q      Okay.  And does this e-mail help refresh
22      your recollection as to where the company -- where
23      the family members are holding the company's cash?
24           A      Yes.  DST.
25           Q      What is DST, if you know?
```

Page 105

1    correctly?

2         A    Are you saying prior to the sale or --

3         Q    Yes.  Prior to the sale that none of the

4    shareholders -- I thought you said none of the

5    shoulders had taken cash away from Catalina Yachts,

6    Inc. that Catalina needed to operate?

7         A    Not that I'm aware of.

8         Q    Okay.  But when we looked at Exhibit, I

9    think it's 11, it's the transaction from Catalina

10   Investments, LLC to Prometheus Maritime Properties,

11   LLC.  Do you remember the deed transactions, first

12   the marina property was transferred from Catalina

13   Yachts, Inc. to Catalina Investments, LLC, and

14   whoever prepared the deed said those companies were

15   related parties because the shareholders were the

16   same.

17             Do you remember that?

18        A    Yes.

19        Q    Okay.  And then the subsequent deed from

20   Catalina Investments, LLC to Prometheus Maritime

21   Properties, LLC, that was the actual third-party

22   transaction of the real estate for 12-plus million

23   dollars, correct?

24        A    Yes.

25        Q    Take a look at Exhibit 11 again if you

Page 106

1    would.  It's that deed.  And at the top of it it
2    says, "I, Number 2024189945."  I just want to make
3    sure you have the right document.
4         A     The one with Prometheus in it?
5         Q     Correct --
6         A     Yes.
7         Q     -- the one where Prometheus is the
8    grantee.
9         A     Yes.
10        Q     Okay.  So at the top of the deed --
11   you've owned property in Florida before, right?
12        A     No, not me.
13        Q     Not you personally?
14        A     No.
15        Q     Okay.  This stamp at the top of the deed
16   reflects that there are doc stamps -- doc stamp
17   collection $87,500.  Do you see that in the second
18   line of the stamp at the top?
19        A     Yes.
20        Q     Okay.  And did you know that in Florida
21   the doc stamp rate is .70 cents per $100 of value
22   transacted?
23        A     I did not know that.
24        Q     Okay.  So if I divide -- I'll ask you to
25   assume that for a moment.  If I divide $87,500 by

Page 107

```
 1    .7, or 70 cents, and then multiply that times 100, I
 2    get $12,500,000, which is the sales price on which
 3    documentary stamp taxes were paid in Florida.
 4              Is that $12,500 sales price consistent
 5    with what you remember Prometheus paying for the
 6    property?
 7         A    Yes.
 8         Q    Okay.  And that money, I think you
 9    testified, was transferred to some account that
10    Catalina Yachts didn't have access to, but the
11    shareholders of Catalina Yachts, Inc. had access to?
12         A    Yes.
13         Q    And this was done at a time where the
14    business was having cash flow problems, right?
15         A    Yes.
16         Q    And the credit card that was being used
17    by Catalina Yachts, Inc. that was taken out on the
18    credit of Sharon Day had unpaid balances at that
19    time, right?
20         A    I do not --
21         Q    July of 2024?
22         A    I don't know what the balance was at that
23    point.
24         Q    Okay.  This is a point in time before she
25    retired though, right?
```

Page 108

1          A     Yes.

2          Q     You don't know if there was a balance on

3     the bill, but the company was having financial

4     problems in July of 2024?

5          A     Yes.

6          Q     And the $12,500,000, I think you

7     testified, was placed in a separate account and all

8     Catalina Yachts, Inc. was given access to was the

9     interest of 60 or $65,000 a month?

10         A     When we asked for it.

11         Q     Okay.  So there were actually funds that

12    were transferred away from Catalina Yachts, Inc. to

13    Catalina shareholders that could have been used to

14    help the company financially?

15         A     Yes.

16         Q     Meaning the $12,500,000?

17         A     Yes.

18         Q     Okay.  And are you aware of whether or

19    not the shareholders of Catalina Yachts, Inc. or

20    Catalina Investments, LLC paid anything for the

21    $12,500,000 that they took from Catalina Yachts,

22    Inc.?

23         A     Can you repeat that?

24         Q     Sure.

25                Either the shareholders of Catalina

Page 109

1    Yachts, Inc. or the shareholders of Catalina

2    Investments, LLC, which is a related company, took

3    $12,500,000 that was the purchase proceeds related

4    to the property that Catalina Yachts, Inc. owned,

5    correct?

6         A    Correct.

7         Q    And my question to you is:  Did the

8    shareholders of Catalina Yachts, Inc. or this

9    related company, Catalina Investments, LLC, pay

10   anything to Catalina Yachts, Inc. for the

11   $12,500,000 they took from Catalina?

12        A    Not that I'm aware of.

13            MR. BERMAN:  I don't have any further

14        questions.

15            MR. KAPLAN:  No questions from me.

16            MR. BERMAN:  Any cross?

17            MS. VALLIER:  Give me one second.  I

18        don't believe so, but one minute, please.

19            I don't have anything further.

20            MR. BERMAN:  Mr. Turner, in Florida

21        witnesses have the right to read the transcript

22        if it's typed up.  You can also waive that

23        right.  There's no legal requirement for you to

24        review the transcript.  If you want to review

25        the transcript and you think Felicia took

Page 32

1    their sort of, as you described it, partnership
2    interest would be paid?
3          A     No, other than Sharon told me -- I'm
4    sorry.  Sharon told me that she would be compensated
5    when the company got sold.
6          Q     Okay.  And part of the company has been
7    sold, right?
8          A     The assets of the company, yes.
9          Q     Okay.  Some of the real estate was sold,
10   and that's where the 12-million-or-so dollars came
11   from, right?
12         A     Correct.
13         Q     And then all of the assets were sold to
14   your new employer -- your newest employer, Catalina
15   Yachts, LLC, right?
16         A     Yes.
17         Q     And are there any assets that Catalina
18   Yachts still owns?
19         A     The property.
20         Q     Okay.  Did you have any understanding
21   from either Mr. Butler or Ms. Day about her rights
22   to compensation upon her retirement?
23         A     Other than I was told that she would get
24   a million dollars once the assets are sold.
25         Q     Okay.  And did you ever have a discussion

# EXHIBIT 9

Nancy Bear
December 10, 2025

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

CATALINA YACHTS, INC., a
California Corporation,

        Plaintiff,

    vs.                   CASE NO. 2:25-CV-04090-SVW-RAO

SHARON DAY, an individual;
GERARD DOUGLAS, an individual;
and DOES 1 through 10,
inclusive,

        Defendants.
_____

AND RELATED CROSS-ACTIONS.
_____

DEPOSITION OF NANCY BEAR

APPEARING REMOTELY

December 10, 2025

10:40 a.m.

REPORTED STENOGRAPHICALLY BY:

Deborah L. Heskett

CVR, CSR No. 11797

APPEARING FROM SAN BERNARDINO COUNTY, CALIFORNIA

Nancy Bear
December 10, 2025

```
 1    REMOTE APPEARANCES:

 2

 3         For Catalina Yachts, Inc.:

 4              ERVIN COHEN & JESSUP, LLP
                MICHAEL LIEB
 5              9401 WILSHIRE BOULEVARD, 12TH FLOOR
                Beverly Hills, California 90212
 6              mlieb@ecjlaw.com

 7

        For Sharon Day:
 8
                SHUMAKER, LOOP & KENDRICK, LLP
 9              STEVEN M. BERMAN
                MICHAEL BILIRAKIS
10              101 East Kennedy Boulevard, Suite 2800
                Tampa, Florida 33602
11              sberman@shumaker.com

12

        Also Present:
13
                SHARON DAY
14
                DAVID DAY
15
                HOLLY HANNAH
16
                JONATHON MASTERS
17
                MARC REESE
18
                RUSSELL BERNEY
19
                EVAN HANNAH
20
                JEAN BUTLER
21

22

23

24

25
```

Nancy Bear
December 10, 2025

1    Q    Okay.  Do you know if any of the $12,500,000

2  from the Salt Creek sales proceeds were set aside to pay

3  Sharon Day her bonus?

4    A    No.

5    Q    You don't know one way or the other, or you

6  know that they were not?

7    A    I'm not aware of anything being put aside, no.

8    Q    Okay.  Did you hear that Catalina Yacht, Inc.,

9  sold its business operations to a person named Michael

10  Reardon?

11    A    Yes.

12    Q    Okay.  What do you know about that transaction?

13    A    Nothing.

14    Q    Okay.  Do you know it happened in 2025?

15    A    Would you -- that's a vague question.  What do

16  you mean?

17    Q    Did you know that Catalina Yacht, Inc., sold

18  its business operations to Michael Reardon in the spring

19  of 2025?

20    A    Yes.

21    Q    And what do you know about the transaction?

22        MR. LIEB:  It's been asked and answered.

23        Go ahead.

24        THE WITNESS:  I just know it was sold.

25  ///

Nancy Bear
December 10, 2025

```
 1   BY MR. BERMAN:
 2        Q    Okay.  Do you know what was sold?
 3        A    Just Catalina Yachts.
 4        Q    Okay.  And after the sale to Michael Reardon,
 5   do you know what Catalina Yachts still owned, if
 6   anything?
 7        A    Catalina Yachts still owned?
 8        Q    After the sale of the church property, the Salt
 9   Creek property, and the business sale to Michael
10   Reardon, did Catalina Yacht, Inc., still own anything?
11        A    Not that I'm aware of.
12        Q    Okay.  You mentioned an individual named Marc
13   Reese.
14             Did I understand your testimony correctly?
15        A    Yes.
16        Q    And I think you said Marc Reese became the
17   president of Catalina Yacht at some point in time after
18   Sharon Day retired; is that correct?
19        A    Repeat that again.
20        Q    Sure.  I think you testified that Marc Reese
21   became the president of Catalina Yacht sometime after
22   Sharon Day retired.
23             Did I understand your testimony correctly?
24        A    Yes.
25        Q    And who is Marc Reese?
```

# EXHIBIT 10

WILL BE FILED UNDER SEAL